# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-SA-00035-SCT

*MISSISSIPPI STATE DEPARTMENT OF HEALTH
AND DESOTO IMAGING & DIAGNOSTICS, LLC*

*v.*

*BAPTIST MEMORIAL HOSPITAL-DESOTO, INC.
d/b/a BAPTIST MEMORIAL HOSPITAL-DESOTO
AND DESOTO DIAGNOSTIC IMAGING, LLC d/b/a
CARVEL IMAGING*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/29/2006 |
| TRIAL JUDGE: | HON. PATRICIA D. WISE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | DONALD E. EICHER, III |
| | THOMAS L. KIRKLAND, JR. |
| | ANDY LOWRY |
| | ALLISON C. SIMPSON |
| ATTORNEYS FOR APPELLEES: | BARRY K. COCKRELL |
| | KATHRYN RUSSELL GILCHRIST |
| | DAVID WELDON DONNELL |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED - 06/19/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DIAZ, P.J., DICKINSON AND RANDOLPH, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     DeSoto Imaging and Diagnostics, LLC ("DeSoto") entered into an agreement with Alliance Imaging ("Alliance") for the provision of mobile magnetic resonance imaging ("MRI") services, contingent upon DeSoto procuring a Certificate of Need ("CON") from the Mississippi State Department of Health ("MSDH"). DeSoto's subsequently filed CON application was opposed by Baptist Memorial Hospital-DeSoto, Inc. ("Baptist") and DeSoto

Diagnostic Imaging, LLC ("Carvel"). Following a three-day hearing, the hearing officer issued his "Proposed Findings of Fact and Conclusions of Law," finding that DeSoto's application complied with the Fiscal Year 2006 Mississippi State Health Plan's ("State Health Plan") "General Certificate of Need Policies," the State Health Plan's "CON Criteria and Standards for the Offering of MRI Services," and the CON Review Manual's "General Considerations," and recommended approval of DeSoto's application.

¶2. Soon thereafter, Gilmore Memorial Hospital ("Gilmore"), a hospital on the proposed mobile route which DeSoto was to join, terminated its MRI Service Agreement with Alliance. Baptist and Carvel then filed a "Joint Motion to Reopen and Supplement Record and for Reconsideration of Hearing Officer's Findings of Fact and Conclusions of Law," alleging that because of this development, the mobile route proposed would not meet requirements of the State Health Plan. Alliance subsequently attested that alteration of routes was common and a modified route would satisfy the State Health Plan's requirements. The hearing officer denied the motion and reaffirmed the recommendation to grant DeSoto's application. The State Health Officer subsequently issued a final order adopting the findings and recommendation of the hearing officer.

¶3. Baptist and Carvel filed a "Notice of Appeal" in the Chancery Court of Hinds County. Following hearing, the chancery court issued an "Opinion and Order" reversing the MSDH's approval of DeSoto's application and remanding to the MSDH "with the mandate that, if [DeSoto] wishes to propose a new MRI route, that new route be subjected to a hearing during the course of review at which interested parties may oppose or support the new route." From that ruling proceeds this appeal filed by DeSoto and the MSDH. The central issue for

2

consideration is not a specific route, but whether the minimum number of procedures required by the State Health Plan to obtain a CON would be met by the new route.

**FACTS**

¶4.    On August 30, 2005, Gordon Smith, area sales manager for Alliance, sent a letter to Kevin Blackwell, president and CEO of DeSoto, providing "written notice of [Alliance's] intention to provide MRI services two (2) days per week at your facility . . . ."  Thereafter, DeSoto filed a CON application with the MSDH for the establishment of mobile MRI services in DeSoto County.  According to DeSoto's application, "[t]he proposed . . . unit is a 1.5 Tesla unit that currently serves [Gilmore] . . . in Amory and Mission Primary Care Clinic [("Mission")] . . . in Vicksburg on a mobile route.  Alliance has confirmed the equipment's exemption for the CON process.[1] [DeSoto] will simply join this existing route."[2]  In support of the application, DeSoto proposed that the number of procedures provided would exceed the requirements of the State Health Plan,[3] that DeSoto County was

_____

[1]Alliance's 1.5 Tesla MRI unit already had been approved by the MSDH.

[2]Initially, the proposed route would service "Gilmore three days a week, [Mission] one day a week, and [DeSoto] two days a week."

[3]The State Health Plan provides, regarding the "Certificate of Need Criteria and Standards for the Offering of MRI Services," that "[t]he entity desiring to offer MRI services must document that *the equipment* shall perform *a minimum of 1,700 procedures per year.* . . . This criterion includes both fixed and *mobile MRI equipment.*"  State Health Plan at XI-47 (emphasis added).  According to DeSoto's application, it "proposes to join an existing mobile MRI route, which is already performing over 1,700 procedures annually, 1,440 procedures at Gilmore in 2004 and 562 procedures at Mission in 2004."  Moreover, Smith testified that the 1,440 procedures performed at Gilmore the previous year were with a 1.0 Tesla MRI unit and that "we will actually be able to do more patients in fewer days . . . by upgrading to the 1.5."  DeSoto projected that it would use the MRI unit for "520 procedures in year one, 650 in year two, and 780 in year three."  This projection factored in population growth in DeSoto County and the purported support of physicians who did not provide

3

experiencing significant population growth,[4] and that an adverse impact on other MRI providers in the General Hospital Service Area was not anticipated. The application added that "[t]he agreement with Alliance is contingent upon the granting of a [CON] pursuant to this Application."

¶5.    On November 7, 2005, Sam Dawkins, Director of the Office of Health Policy and Planning for the MSDH, received letters from Baptist and Carvel opposing the application. Ten days later, an MSDH staff analysis concluded that DeSoto's application "is not in substantial compliance with applicable criteria and standards[,]"[5] and recommended disapproval.[6]

¶6.    On December 5, 2005, a "Request for Public Hearing During the Course of Review" was received by the MSDH from DeSoto, Carvel, and Baptist. In March 2006, a three-day hearing was held regarding DeSoto's application. Twelve witnesses testified, and twenty-four exhibits were introduced into evidence. On July 6, 2006, the hearing officer issued his

---

affidavits for fear of repercussions from Baptist, as DeSoto's submitted physician affidavits totaled only 372 annual projected MRI procedure referrals.

[4]The application provided that "sustained growth has made DeSoto County the 35th fastest growing county in the nation and places DeSoto County as Mississippi's 4th most populated county and Mississippi's fastest growing county."

[5]The staff analysis claimed that DeSoto's application failed to meet either the State Health Plan Need Criterion, CON Review Manual General Consideration 1 - State Health Plan, CON Review Manual General Consideration 4 - Economic Viability, CON Review Manual General Consideration 5 - Need for the Project, or CON Review Manual General Consideration 8 - Relationship to Existing Health Care System.

[6]It is conceded by all parties that the Staff Analysis is "an intermediate step on the way to the final decision of the State Health Officer," and is entitled to no deference on appeal.

"Proposed Findings of Fact and Conclusions of Law," finding that DeSoto's application complied with the State Health Plan's "General Certificate of Need Policies," the State Health Plan's "CON Criteria and Standards for the Offering of MRI Services,"[7] and the CON Review Manual's "General Considerations."[8]  According to the hearing officer:

[7]The hearing officer found that:

[t]he number of scans performed by [Alliance] at Gilmore and [Mission] when combined exceed 1,700.  As Smith pointed out, it is not uncommon to alter routes or lose contracts.  While this issue does become a bit convoluted, *the fact remains that Alliance has been and continues to serve these two facilities with mobile MRI service. . . . [T]he mobile route that includes [Gilmore], [Mission] and [DeSoto] will easily exceed the required 1,700 procedures per year*.

(Emphasis added).

[8]Regarding CON Review Manual General Consideration 1 - State Health Plan, the Hearing Officer found "the [a]pplication to be consistent with the applicable requirements set forth in the State Health Plan."  As to CON Review Manual General Consideration 4 - Economic Viability, the hearing officer determined that "[t]here is substantial evidence in the record that, based on the scans projected, the [DeSoto] project will be financially viable." Under CON Review Manual General Consideration 5 - Need for the Project, the hearing officer found "the service specific need criteria for the provision of MRI services is controlling," but added that the service will meet the needs of DeSoto County's growing population as evidenced by the positive community reaction to the application.  Finally, regarding CON Review Manual General Consideration 8 - Relationship to Existing Health Care System, the hearing officer found:

the record contains substantial evidence that this project complies with the service specific criteria set forth in the State Health Plan.  With that determination, it seems the addition of another MRI provider in DeSoto County will have little, if any, impact on the existing providers. *There was no specific evidence from either [Baptist] or [Carvel] that they will suffer any sort of adverse impact, financial or otherwise, from the approval of this [a]pplication*.

(Emphasis added).  Baptist expressly stipulated at the hearing that it was "not contending that the project . . . will adversely impact [Baptist] from a financial standpoint."

5

> [u]ltimately . . . *the determination of need, defined by the State Health Plan as 1,700 scans per year, is controlling*. That said, however, this Application is troublesome in several ways. The *route* of which this new service will be a part is *less than concrete*. The provider of the mobile unit, [Alliance], is engaged in contract negotiations with [Gilmore] and is currently providing service at that location on a month to month basis.

(Emphasis added). Therefore, as "the record contains substantial evidence that the proposed new service will join a mobile route that will produce in excess of 1,700 scans per year," the hearing officer recommended approval of DeSoto's application.

¶7. On July 14, 2006, Monte Bostwick, CEO of Gilmore, sent a letter to Alliance providing that "[t]his letter is to serve as our *30-day notice to terminate the MRI Service Agreement between [Alliance] and [Gilmore]*." (Emphasis added). On July 24, 2006, Baptist and Carvel filed a "Joint Motion to Reopen and Supplement Record and for Reconsideration of Hearing Officer's Findings of Fact and Conclusions of Law," arguing that "[o]ne . . . issu[e] in the hearing was whether the proposed MRI route would perform in excess of 1,700 MRI procedures per year. In light of this recent development, . . . the mobile route will not meet that State Health Plan requirement." As such, the motion requested that this new evidence be admitted into the record and considered by the hearing officer "in order for a true, accurate and complete evaluation of this application to be made by the [MSDH]."

¶8. In response, an affidavit of Cindy Smith, Director of Operations for Alliance, was presented attesting that "[i]n the mobile MRI industry it is common for mobile MRI routes to be altered and/or for contracts for mobile MRI services to be amended or cancelled." Smith stated DeSoto would be shifted to a route including Sweetwater Hospital Association ("Sweetwater") in Sweetwater, Tennessee, and Macon General Hospital ("Macon") in

6

Lafayette, Tennessee, as the MRI unit used on that route "currently sits idle two days a week." Smith averred that the route change would not affect the approval of DeSoto's application, as Sweetwater and Macon had performed 2,323 MRI procedures combined in the previous twelve months.[9]

¶9.     Following a August 11, 2006, hearing, the hearing officer entered his "Findings and Conclusions on Motion to Re-Open Record," concluding that:

> *[t]he [MSDH] is in the best position to interpret the statutes and regulations that it enforces on a daily basis. Accordingly, I concur with the [MSDH's] analysis of this matter.* I find that the hearing officer does retain jurisdiction over the disposition of this motion. *While there might be, as the Contestants suggest, an occasion where the record might be reopened, this is not it for the reasons set out by the [MSDH].*[10] *The motion of the Contestants is therefore denied. As a result, the hearing officer's recommendation to the State Health*

---

[9]In its response, DeSoto added that, including its projected procedures, the MRI unit would perform 2,843 MRI procedures in the first year.

[10]The hearing officer stated:

any time during the hearing process the applicant would have the right to change the proposed route both as an amendment to the application or as new evidence at the hearing, especially considering the fact that the route change was due to the fact that the termination of the contract by Gilmore occurred without the apparent involvement of [DeSoto]. The fact that the change happened during the perfect window of time between the Hearing Officer's recommendation and the decision of the State Health Officer is irrelevant, but rather perhaps just circumstantial timing, because *had the CON been issued the change in route would not have been a change in scope under the Certificate of Need Manual, revision 2000. Under this analysis of the probable changes in mobile MRI routes that happen as a matter of course and business practice, [MSDH] would assert that no change in the mobile MRI route would be a change in scope and would only be material from the standpoint of the staff at [MSDH] if the change would result in the criteria for need under the State Health Plan not being satisfied, a fact that [MSDH] asserts is not the case in the facts as presented.*

(Emphasis added).

7

*Officer remains unchanged*. To ensure a complete record, however, I believe it appropriate to append all pleadings relating to the Contestant's motion . . . . *The appended documentation shall be in the form of proffered information not accepted as evidence.*

(Emphasis added). On August 31, 2006, a letter from the State Health Officer to DeSoto constituted a final order adopting the findings and recommendation of the hearing officer, concluding that DeSoto's application was "in substantial compliance with the [MSDH's] adopted Plans, criteria, and standards." Baptist and Carvel then filed their "Notice of Appeal" of the MSDH's final order in the chancery court.

¶10. Following a hearing, the chancery court, in its "Opinion and Order," concluded "that the MSDH erred in its decision to approve the CON application submitted by [DeSoto]. Specifically, the MSDH's decision was arbitrary and capricious and contrary to the manifest evidence in the case as to the mobile route that was proposed by [DeSoto Imaging]."[11] Moreover, the chancery court found that:

> the MSDH committed reversible error in its handling of the matter raised post-hearing by [Baptist] and [Carvel]. At the least, the post-hearing motion filed by [Baptist] and [Carvel] should have required [DeSoto] to file a new application, proposing a new route which satisfied the State Health Plan's requirements.

The chancery court concluded that the failure to do so violated "fundamental notions of due process, as well as the requirements of the CON statutes themselves[,]" in that "no affected

---

[11]In so finding, the chancery court focused upon the fact that:

[t]he suggestion that [Gilmore] or [Mission] might be convinced to take fewer days of service was pure speculation, and no evidence was presented to show that Gilmore or [Mission] would accept reduced days of coverage on the MRI route. Additionally, there was no specific and substantial evidence to support the theory that "operational efficiency" could make the route workable.

8

party . . . has had an opportunity to contest this new proposal." The chancery court reversed the MSDH's approval of DeSoto's application and remanded to the MSDH "with the mandate that, if [DeSoto] wishes to propose a new MRI route, that new route be subjected to a Hearing During the Course of Review at which interested parties may oppose or support the new route." DeSoto and the MSDH then filed a "Notice of Appeal."[12]

## ISSUES

¶11. This Court will consider:

(1) Whether the MSDH had substantial evidence upon which to base its finding that DeSoto satisfied the State Health Plan's "CON Criteria and Standards for the Offering of MRI Services," the State Health Plan's "General Certificate of Need Policies," and the CON Review Manual's "General Considerations."

(2) Whether the MSDH committed reversible error in approving DeSoto's application after a new route was substituted following the recommended approval of the hearing officer but before the final order of the State Health Officer.

## ANALYSIS

### I.

**Whether the MSDH had substantial evidence upon which to base its finding that DeSoto satisfied the State Health Plan's "CON Criteria and Standards for the Offering of MRI Services," the State Health Plan's "General Certificate of Need Policies," and the CON Review Manual's "General Considerations."**

¶12. "On appeal, this Court conducts a de novo review of the chancellor's action, constrained by the same familiar standard of review under which he operated." ***Miss. State***

---

[12]The order of the chancery court has been stayed until the mandate of this Court is issued.

9

***Dep't of Health v. Miss. Baptist Med. Ctr.***, 663 So. 2d 563, 574 (Miss. 1995) (citing ***Miss.***

***State Dep't of Health v. Southwest Miss. Reg'l Med. Ctr.***, 580 So. 2d 1238, 1240 (Miss.

1991)).  The final order of the State Health Officer regarding a CON application is:

> subject to judicial review, but that review is limited by statute, which provides
> in part:

>> The order shall not be vacated or set aside, either in whole or in
>> part, except for errors of law, *unless the court finds that the*
>> *order of the [MSDH] is not supported by substantial*
>> *evidence,*[13] *is contrary to the manifest weight of the evidence,*
>> *is in excess of the statutory authority or jurisdiction of the*
>> *[MSDH], or violates any vested constitutional rights of any*
>> *party involved in the appeal . . . .*

***Jackson HMA, Inc. v. Miss. State Dep't of Health***, 822 So. 2d 968, 970 (Miss. 2005)

(quoting Miss. Code Ann. § 41-7-201(2)(f)) (emphasis added).  A "presumption of validity"

attaches to the MSDH's decision, ***Miss. Baptist Med. Ctr.***, 663 So. 2d at 579, and this Court

is limited to "reviewing the lower court's decision to determine whether the record can

support this finding.  This Court may not substitute its own judgment for that of the agency

which rendered the decision, nor may we re-weigh the facts of the case." ***Pub. Employees'***

***Ret. Sys. v. Dishmon***, 797 So. 2d 888, 892 (Miss. 2001) (citing ***Miss. Pub. Serv. Comm'n***

***v. Merchants Truck Line, Inc.***, 598 So. 2d 778, 782 (Miss. 1992)).  "This duty of deference

derives from our realization that the everyday experience of the administrative agency gives

---

[13]"Substantial evidence means more than a scintilla or a suspicion." ***Miss. State Dep't***
***of Health v. Natchez Cmty. Hosp.***, 743 So. 2d 973, 977 (Miss. 1999).  *See also* ***Falco Lime***
***v. Mayor & Aldermen of Vicksburg***, 836 So. 2d 711, 721 (Miss. 2002) (quoting ***Johnson***
***v. Ferguson***, 435 So. 2d 1191, 1195 (Miss. 1983) (citation omitted)) ("[w]e consider the
substantial evidence requirement to have been met when the record includes 'such relevant
evidence as reasonable minds might accept as adequate to support a conclusion,' which must
be 'more than a mere 'scintilla' of evidence.'").

it familiarity with the particularities and nuances of the problems committed to its care which no court can hope to replicate." *Dunn v. Miss. State Dep't of Health*, 708 So. 2d 67, 72 (Miss. 1998) (quoting *Gill v. Miss. Dep't of Wildlife Conservation*, 574 So. 2d 586, 593 (Miss. 1990)). However, deference is by no means a "rubber stamp." *Miss. Baptist Med. Ctr.*, 663 So. 2d at 579 (quoting *Miss. State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 489 (Miss. 1993)). "[W]here an administrative agency errs as a matter of law, courts of competent jurisdiction should not hesitate to intervene." *Grant Ctr. Hosp., Inc. v. Health Group of Jackson, Inc.*, 528 So. 2d 804, 808 (Miss. 1988).

¶13. A CON must be obtained by the proposed provider of MRI services "if those services have not been provided on a regular basis . . . within the period of twelve (12) months prior to the time such services would be offered." Miss. Code Ann. § 41-7-191(1)(d)(xii) (Rev. 2005). "[T[he [MSDH] is charged with reviewing applications for [CON's], in accordance with the health care policies and priorities of this State. In an effort to have uniformity in its decisions, the legislature promulgated by statute that these policies be set forth annually in the State Health Plan." *St. Dominic-Jackson Mem'l Hosp. v. Miss. State Dep't of Health*, 728 So. 2d 81, 83 (Miss. 1998) (citing Miss. Code Ann. § 41-7-173(s)). Regarding the "CON Criteria and Standards for the Acquisition or Otherwise Control of MRI Equipment and/or the Offering of MRI Services," the State Health Plan provides:

> [t]he [MSDH] will review applications for a [CON] . . . under the applicable statutory requirements of Sections 41-7-173, 41-7-191, and 41-7-193, Mississippi Code of 1972, as amended. *The [MSDH] will also review applications for [CON] according to the general criteria listed in the Mississippi Certificate of Need Review Manual; all adopted rules, procedures, and plans of the [MSDH]; and the specific criteria and standards listed below.*

State Health Plan at XI-46 (emphasis added). In its review, the MSDH "intends to approve an application for CON if it substantially complies with the projected need and with the applicable criteria and standards presented in this Plan . . . ." State Health Plan at I-2.

A. *"CON Criteria and Standards for the Offering of MRI Services"*

¶14. Blackwell testified, and Dawkins conceded,[14] that the policy of the MSDH is to "give preference to those applicants proposing to enter into joint ventures utilizing mobile and/or shared equipment."[15] State Health Plan at XI-45. As to the service-specific need criterion for the offering of MRI services, the State Health Plan provides:

> *[t]he entity desiring to offer MRI services must document that the equipment shall perform a minimum of 1,700 procedures per year.*[16] *. . . This criterion includes both fixed and mobile MRI equipment.*
>
> *Applicants for non-hospital based MRI facilities may submit affidavits from referring physicians in lieu of the estimation methodology required for hospital based facilities.* MRI procedures projected in affidavits shall be based on actual MRI procedures referred during the year.
>
> *It is recognized that a particular MRI unit may be utilized by more than one provider of MRI services; some of which may be located outside of Mississippi. In such cases all existing or proposed providers of MRI services must jointly meet the required service volume of 1,700 procedures annually.* If the MRI unit in question is presently utilized by other providers of MRI

---

[14]Dawkins directed the staff analysis and testified at the hearing.

[15]This preference, however, does not alter the requirement that "the applicant must meet the applicable CON criteria and standards provided herein and the general criteria and standards contained in the currently approved Mississippi [CON] Review Manual." State Health Plan at XI-45.

[16]The State Health Plan also notes that "*[o]ptimum utilization* of a single MRI machine ranges between 2,000 and 2,500 procedures per year." State Health Plan at XI-14 (emphasis added). Dawkins admitted that the 2,000-2,500 optimum utilization figure is not a CON requirement.

services, the actual number of procedures performed by them during the most recent 12-month period may be used instead of the formula projections.

State Health Plan at XI-47 (emphasis added). The hearing officer found that:

> [t]he number of scans performed by [Alliance] at Gilmore and [Mission] when combined exceed 1,700. As Smith pointed out, it is not uncommon to alter routes or lose contracts. While this issue does become a bit convoluted, *the fact remains that Alliance has been and continues to serve these two facilities with mobile MRI service. . . . [T]he mobile route that includes [Gilmore], [Mission] and [DeSoto] will easily exceed the required 1,700 procedures per year*.

(Emphasis added). This conclusion was adopted by the State Health Officer.

¶15. DeSoto initially presented evidence that Alliance's 1.5 Tesla MRI unit would perform more than 1,700 procedures annually among Gilmore, Mission, and DeSoto, based on the procedures performed at Gilmore and Mission in the most recent twelve-month period in conjunction with projections for DeSoto. *See* State Health Plan at XI-47. Specifically, in 2004, 1,440 MRI procedures were performed at Gilmore and 562 MRI procedures were performed at Mission. Additionally, DeSoto presented physician affidavits, in compliance with the State Health Plan, accounting for 372 additional projected MRI referrals.[17] Furthermore, Falls, also accepted as an expert in healthcare planning and systems analysis, testified that DeSoto's application "complied . . . with all of the required criteria and standards[.]" He added that in his review of prior staff analyses, DeSoto's application "was the only mobile MRI application recommended for denial by the staff since 2003. . . . [I]t was

---

[17]In his review, of "every Staff Analysis from 2003 through February of 2006[,]" Noel Falls, accepted as an expert on the CON process, testified that "[m]any . . . applications have no affidavits. Many . . . had no letters of support. They had projections . . . provided by the applicant that were not questioned in the Staff Report."

13

the only . . . application in which this particular method of applying the 1,700 and 2,500 numbers was applied . . . ."  Ed Witek, accepted as an expert in health planning and healthcare finance, conceded that DeSoto "can show that the route of the magnet has 1,700 or more procedures per year and meet that definition . . . ."  Finally, Smith testified that "[t]here's nothing I know about at this point that precludes" the viability of the Gilmore-Mission-DeSoto route.[18]  Alliance was still under contract with Gilmore and Mission at the time of the hearing, and Smith testified that the proposed schedule was feasible given the upgraded power of the 1.5 Tesla MRI unit.

¶16.    Applying the "presumption of validity" to the MSDH's decision, *Miss. Baptist Med. Ctr.*, 663 So. 2d at 579, this Court concludes that substantial evidence, i.e., "more than a scintilla or a suspicion[,]" *Natchez Cmty. Hosp.*, 743 So. 2d at 977, is present in the record to support the finding that the number of procedures exceeded the requirements of the State Health Plan.  Therefore, DeSoto complied with the "CON Criteria and Standards for the Offering of MRI Services." *See Dishmon*, 797 So. 2d at 892; State Health Plan at I-2, XI-47.

*B.  "General Certificate of Need Policies"*

¶17.    The State Health Plan states the following "General Certificate of Need Policies":

> To prevent unnecessary duplication of health resources[.]
>
> To provide cost containment[.]

---

[18]At the time of both the hearing and the issuance of the Hearing Officer's "Proposed Findings of Fact and Conclusions of Law," Gilmore and Alliance remained under contract via an MRI Service Agreement.  As DeSoto and the MSDH point out, "[t]here was no record evidence that Gilmore or Mission would *not* accept that arrangement, and thus it was speculative at best that entities already doing business with Alliance would cease to do so."

14

> To improve the health of Mississippi residents[.]
>
> To increase the accessibility, acceptability, continuity, and quality of health services[.]
>
> While all of the stated purposes of health planning and health regulatory activities are important, *cost containment and the prevention of unnecessary duplication of health resources are the primary purposes and shall be given primary emphasis in the [CON] process*.

State Health Plan at I-2 (emphasis added). The hearing officer found that given "the demands and growth of the population in DeSoto County, the changes in MRI technology, and the growing medical community in the area[,]" along with "substantial evidence that the proposed service will promote and provide accessibility, acceptability, and continuity and quality of health services for the residents of DeSoto County and Mississippi[,]" DeSoto's application was "supported by substantial evidence demonstrating compliance with the goals of the Plan." This conclusion was adopted by the State Health Officer.

¶18. DeSoto presented evidence that DeSoto County was the fastest-growing county in Mississippi and the thirty-fifth fastest-growing county in the United States. Additionally, numerous qualified individuals testified at the hearing as to the impact of population growth on healthcare provision. Furthermore, Falls provided expert testimony that this population growth mitigated any adverse impact upon existing providers as "based on the growing incidence rate . . . of MRIs, coupled with the explosive population growth in DeSoto County, there's going to be plenty of volume for the existing units . . . ." According to Falls, the additional mobile MRI service would "improve accessibility and availability of healthcare service to the residents of Mississippi[.]" This evidence supports the finding that the population growth in DeSoto County has created a need for additional MRI services toward

15

the end of improving the health of Mississippi residents. Of additional import, expert testimony indicated that DeSoto's proposed provision of MRI services could meet that need in a manner which would not infringe upon the financial viability of existing providers, while simultaneously increasing accessibility of MRI services in DeSoto County.

¶19.　Applying the "presumption of validity" to the MSDH's decision, **Miss. Baptist Med. Ctr.**, 663 So. 2d at 579, this Court concludes that substantial evidence, i.e., "more than a scintilla or a suspicion[,]" **Natchez Cmty. Hosp.**, 743 So. 2d at 977, supported the finding that DeSoto's application satisfied the State Health Plan's "General Certificate of Need Policies." *See* **Dishmon**, 797 So. 2d at 892.

*C. "General Considerations"*

¶20.　The CON Review Manual contains "General Considerations," including:

> [p]rojects will be reviewed by the [MSDH] as deemed appropriate. Review, evaluation, and determination of whether a CON is to be issued or denied will be based upon the following general considerations and any service specific criteria which are applicable to the project under consideration.
>
> 1. *State Health Plan*: The relationship of the health services being reviewed to the applicable State Health Plan.
>
> * * *
>
> 4. *Economic Viability*: The immediate and long-term financial feasibility of the proposal, as well as the probable effect of the proposal on the costs and charges for providing health services by the institution or service. Projections should be reasonable and based upon generally accepted accounting procedures.
>
> * * *
>
> 5. *Need for the Project*: One or more of the following items *may* be considered in determining whether a need for the project exists:

16

a.  The need that the population served or to be served has for the services proposed to be offered or expanded . . . .

c.  The current and projected utilization of like facilities or services within the proposed service area will be considered in determining the need for additional facilities or services. Unless clearly shown otherwise, data where available from the Division of Health Planning and Resource Development shall be considered to be the most reliable data available.

d.  *The probable effect of the proposed facility or service on existing facilities or services providing similar services to those proposed will be considered.*  When the service area of the proposed facility or service overlaps the service area of an existing facility or service, then the effect on the existing facility or service may be considered.  The applicant or interested party must clearly present the methodologies and assumptions upon which any proposed project's impact on utilization in affected facilities or services is calculated.  Also, the appropriate and efficient use of existing facilities/services may be considered.

e.  The community reaction to the facility should be considered. The applicant may choose to submit endorsements from community officials and individuals expressing their reaction to the proposal. . . .

* * *

8.  ***Relationship to Existing Health Care System***: The relationship of the services proposed to be provided to the existing health care system of the area in which the services are proposed to be provided.

CON Review Manual at 57-59 (emphasis added).

*State Health Plan*

¶21.    The Hearing Officer found DeSoto's application "to be consistent with the applicable requirements set forth in the State Health Plan."  This finding was adopted by the State Health Officer, who added that DeSoto's application was "in substantial compliance with the [MSDH's] adopted Plans, criteria, and standards."  The record clearly reveals that the MSDH

17

was presented with substantial evidence to support that conclusion. *See* Issue I.(A.) *supra*. Additionally, an expert witness testified that "there was a need for the proposed service and equipment," and that the DeSoto application "complied . . . with all of the required criteria and standards." Applying the "presumption of validity" to the MSDH's decision, ***Miss. Baptist Med. Ctr.***, 663 So. 2d at 579, this Court concludes that substantial evidence is present in the record to support the finding that DeSoto's application satisfied this "General Consideration." *See **Dishmon***, 797 So. 2d at 892.

*Economic Viability*

¶22. The hearing officer was presented with conflicting expert testimony on the subject of economic viability. While Witek asserted that DeSoto understated its annual projected lease expense by $178,000, rendering the operation unprofitable after its first two years, Falls minimized the significance of that alleged mistake, stating "we're quibbling over eight total scans per year, to make this project . . . financially feasible." Ultimately, the hearing officer found "substantial evidence in the record that, based on the scans projected, the [DeSoto] project will be financially viable." This finding was adopted by the State Health Officer.

¶23. Carvel now argues that "the only procedure numbers which [DeSoto] may even arguably rely on to calculate the financial feasibility of this [a]pplication are the numbers attested to in the attached affidavits of the eight supporting physicians." However, this Court finds that the MSDH was presented with substantial evidence, i.e., "more than a scintilla or a suspicion[,]" ***Natchez Cmty. Hosp.***, 743 So. 2d at 977, that DeSoto's projections were reasonable. *See* footnote 3 *supra*. As the MSDH's decision is presumed valid, *see **Miss. Baptist Med. Ctr.***, 663 So. 2d at 579, the presence of competing expert opinions on the issue

18

of economic viability leads this Court to conclude that substantial evidence is present in the record to support the finding that DeSoto's application satisfied this "General Consideration." *See Dishmon*, 797 So. 2d at 892.

*Need for the Project*

¶24. In assessing this "General Consideration," the hearing officer found "the service specific need criteria for the provision of MRI services is controlling." The hearing officer added that the DeSoto project will meet the MRI service needs of DeSoto's County's growing population as evidenced by the positive community reaction to the application at the hearing. This finding was adopted by the State Health Officer.

¶25. This "General Consideration" provides that the listed items "*may* be considered in determining whether a need for the project exists . . . ." CON Review Manual at 57 (emphasis added). The use of the permissive language "may," as opposed to the mandatory language "shall," leaves this consideration within the discretion of the MSDH. *See Hill Bros. Constr. v. Miss. Transp. Comm'n*, 909 So. 2d 58, 66 (Miss. 2005). Accordingly, this Court grants discretion to the MSDH, presumes the validity of its decision, *see Miss. Baptist Med. Ctr.*, 663 So. 2d at 579, and concludes that substantial evidence is present in the record, *see* Issue I.(A.) and I.(C.)(State Health Plan) *supra*, to support the finding that DeSoto's application satisfied this "General Consideration." *See Dishmon*, 797 So. 2d at 892.

*Relationship to Existing Health Care System*

¶26. The hearing officer determined this "General Consideration" was fulfilled as the service-specific need criterion of the State Health Plan was satisfied and, therefore, "the addition of another MRI provider in DeSoto County will have little, if any, impact on the

existing providers." It is important to note that the hearing officer found neither Baptist nor Carvel provided "specific evidence . . . that they will suffer any sort of adverse impact, financial or otherwise, from the approval of this [a]pplication." Baptist expressly stipulated that it was not asserting adverse financial impact. These findings were adopted by the State Health Officer. Additionally, Falls provided testimony that DeSoto County was "under-represented in the number of MRIs one would expect to occur in the population[,]" and the DeSoto project would not adversely impact other MRI providers "based on the growing incidence rate . . . or use rate of MRIs, coupled with the explosive population growth in DeSoto County . . . ." Applying the "presumption of validity" to the MSDH's decision, **Miss. Baptist Med. Ctr.**, 663 So. 2d at 579, this Court concludes once again that substantial evidence is present in the record for the separate finding that DeSoto's application satisfied this "General Consideration." *See **Dishmon***, 797 So. 2d at 892.

*Conclusion*

¶27. In total, this Court finds that substantial evidence was offered throughout this proceeding to support the ultimate finding that DeSoto's application satisfied the "CON Criteria and Standards for the Offering of MRI Services," the "General Certificate of Need Policies," and the contested "General Considerations." Given the MSDH's "familiarity with the particularities and nuances of the problems committed to its care[,]" **Dunn**, 708 So. 2d at 72, this Court finds that it is obligated to defer to the MSDH's judgment in the absence of a breach of established requirements. Accordingly, this Court concludes that the chancery court erred in finding the MSDH's grant of DeSoto's application was "arbitrary and capricious and contrary to the manifest evidence in the case . . . ."

20

**Whether the MSDH committed reversible error in approving DeSoto's application after a new route was substituted following the recommended approval of the hearing officer but before the final order of the State Health Officer.**

¶28.   This Court previously has stated that:

[a]dministrative agencies are ambiguous creatures born of necessity, mired in the tension between public policy and personal claims of right. *They pursue pragmatically the public interest balancing the utilitarian (and expertly divined) calculus of aggregate net benefit against the individual's claim to fair opportunity and process.* They address pressing questions of political economy and science where there are seldom easy answers and almost never only two points of view. Our administrators also regulate and facilitate individual enterprise without which the public interest will surely suffer. Here, as well, "the life of the law has not been logic; it has been experience."

*McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 315-16 (Miss. 1992) ("*McGowan II*") (citations omitted) (emphasis added). Given that status:

[t]his Court has generally accorded *great deference to an administrative agency's construction of its own rules and regulations and the statutes under which it operates. . . .* This Court has noted that "an agency's interpretation of a regulation it has been authorized to promulgate is entitled to great deference and *must be upheld unless it is so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law*."

*Buelow v. Glidewell*, 757 So. 2d 216, 219 (Miss. 2000) (quoting *Tower Loan of Miss., Inc. v. Miss. State Tax Comm'n*, 662 So. 2d 1077, 1081 (Miss. 1995)) (emphasis added). "This duty of deference derives from our realization that the everyday experience of the administrative agency gives it familiarity with the particularities and nuances of the problems committed to its care which no court can hope to replicate." *Dunn*, 708 So. 2d at 72. *See also Int'l Bd. of Teamsters v. Daniel*, 439 U.S. 551, 566, 99 S. Ct. 790, 58 L. Ed. 2d 808

(1979) (administrative agency deference "is a product both of an awareness of the *practical expertise* which an agency normally develops, *and of a willingness to accord some measure of flexibility to such an agency as it encounters new and unforeseen problems over time*.") (emphasis added). A new and unforeseen problem arose in the case *sub judice* in that the proposed route which DeSoto was to join was rendered prospectively insufficient to produce the minimum number of annual procedures required by the State Health Plan by Gilmore's termination of its MRI Service Agreement with Alliance, after the hearing officer's recommendation to grant DeSoto's application, but before the State Health Officer ruled thereon.

¶29. The hearing officer was aware that Alliance was renegotiating the terms of its contract with Gilmore, which recently had been acquired by Healthcare Management Associates, and that their current proposal of three days (including a Saturday) had not yet been accepted.[19] Smith testified that Alliance was "*operating right now with Gilmore on a month-to-month basis*[,]" further noting that "*[i]t's a possibility that we could lose a contract at any point in time*[,]" but that "*[i]f we lose the Gilmore contract, we have many, many more contracts . . . and customers that we can put in those places*." (Emphasis added). The hearing officer was well aware that "[t]he route of which this new service will be a part is less than concrete[,]" when he recommended approval of DeSoto's application. After Gilmore terminated its MRI Service Agreement with Alliance, a subsequent hearing was held to consider Baptist and Carvel's "Joint Motion to Reopen and Supplement Record and for Reconsideration of Hearing Officer's Findings of Fact and Conclusions of Law." The

---

[19]Mission was still under contract for two years with "no out clause."

22

hearing officer was aware of Smith's affidavit, which provided that "[i]n the mobile MRI industry it is common for mobile MRI routes to be altered and/or for contracts for mobile MRI services to be amended or cancelled" and that DeSoto would be added to a route which performed 2,323 MRI procedures in the previous twelve months. After due consideration, the hearing officer denied the motion and affirmed his recommendation to grant DeSoto's application. In so finding, the hearing officer determined that if a CON had been issued, a changed route would not constitute a change in scope under Section 100.01 of the CON Review Manual, as it was immaterial given the frequency of changes in mobile MRI routes, especially when combined with the need requirement sufficiency of the new route. The State Health Officer adopted this finding. The chancery court reversed the MSDH's decision. The chancellor specifically concluded that "fundamental notions of due process, as well as the requirements of the CON statutes themselves[,]" should have required DeSoto "to file a new application, proposing a new route which satisfied the State Health Plan's requirements."

¶30. Baptist argues that the hearing officer's denial of its motion to reopen and supplement the record and accompanying recommendation to grant DeSoto's application, adopted by the State Health Officer, contravened Mississippi Code Annotated Section 41-7-197(2) in that "any person affected by the proposal being reviewed" was not given the opportunity to "conduct reasonable questioning of persons who make relevant factual allegations concerning the proposal." *See* Miss. Code Ann. § 41-7-197(2) (Rev. 2005). Additionally, on appeal, Baptist and Carvel incorporated a due-process argument in that:

> [t]he new route proposed by [DeSoto] has never been part of any CON application. It has never been reviewed by the MSDH staff. It has never been disclosed to the public. Affected parties have never been notified that this

23

proposed route was even being considered by the MSDH. [Appellees] have never had the opportunity to challenge this route through subpoenas of documents and questioning of witnesses. Despite all of this, the MSDH has, in effect, approved an application based on an MRI route which has never been subjected to administrative nor public scrutiny.

The chancery court agreed, relying upon the perceived applicability of Mississippi Code Annotated Section 41-7-197 and "fundamental notions of due process," in finding "the MSDH did not have the legal authority . . . to approve a new proposal for an MRI service in a post-hearing affidavit format, without requiring the applicant to submit a full, new substantive application and subjecting the new route to public and regulatory scrutiny."

¶31.   DeSoto and the MSDH respond that:

[n]othing changed in [DeSoto's] application except for the identities of the other two providers on the route. The CON laws require that a hearing be afforded to challengers of a CON application or a staff analysis, *and a hearing was provided*. The laws do *not* require that an application be rejected, or that a new hearing be held, if any facts in the application change after that hearing.[20]

As to due process, DeSoto and the MSDH argue:

the [MSDH] made its position known, as regards the negligible effect of the new route on [DeSoto's] CON application, in its motion of August 9, 2005. The details of the new route had been made available to the Appellees even earlier, on July 26, when [DeSoto] provided the Cindy Smith affidavit. The hearing officer heard the motion on August 11, 2005. Thus, Appellees cannot maintain that they were not afforded "notice, and an opportunity to be heard." Under the unusual circumstances, and given the flexibility afforded the [MSDH], that sufficed for due process.

DeSoto and the MSDH further argue, "[t]his case involved an unusual circumstance not foreseen by the CON statutes or by the [MSDH's] regulations. Therefore, it was exactly the

_____

[20]Regarding notice, DeSoto and the MSDH maintain that "the notice is of the fact of the application itself, not of every detail therein."

kind of case in which the [MSDH's] expertise should have been afforded great deference as it decided how to handle the situation before it . . . ." Finally, DeSoto and the MSDH maintain that:

> the chancery court awarded relief that the Appellees *never sought from the [MSDH]*. In their joint motion to reopen the record, the Appellees sought *only* to supplement the record with the fact of Gilmore's withdrawal from the proposed route, and to seek the rejection of the application on that basis. . . . [T]hey *never* moved the hearing officer or the [MSDH] for a new hearing.

(Emphasis added). As such, DeSoto and the MSDH argue that any applicable right to a hearing was waived.

¶32. Mississippi Code Annotated Section 41-7-197 provides, in pertinent part, that:

> (1) *The [MSDH] shall adopt and utilize procedures for conducting certificate of need reviews. Such procedures shall include, inter alia, the following*: (a) written notification to the applicant; (b) written notification to health care facilities in the same health service area as the proposed service; (c) written notification to other persons who prior to the receipt of the application have filed a formal notice of intent to provide the proposed service in the same service area; and (d) notification to members of the public who reside in the service area where the service is proposed, which may be provided through newspapers or public information channels.

> (2) . . . Any such hearing shall be conducted by a hearing officer designated by the [MSDH]. At such hearing, *the hearing officer and any person affected by the proposal being reviewed may conduct reasonable questioning of persons who make relevant factual allegations concerning the proposal. . . .* A record of the hearing shall be made, which shall consist of a transcript of all testimony received, all documents and other material introduced by any interested person, the staff report and recommendation and such other material as the hearing officer considers relevant, including his own recommendation, which he shall make within a reasonable period of time after the hearing is closed and after he has had an opportunity to review, study and analyze the evidence presented during the hearing. The completed record shall be certified to the State Health Officer, who shall consider only the record in making his decision, and shall not consider any evidence or material which is not included therein. All final decisions regarding the issuance of a certificate of need shall

25

be made by the State Health Officer. The State Health Officer shall make his written findings and issue his order after reviewing said record.

Miss. Code Ann. § 41-7-197 (Rev. 2005) (emphasis added). Regarding "Changes in Scope of Approved Project," the CON Review Manual states, "[a]pplicants for a CON should clearly understand that if an approved project is changed substantially in scope – in construction, services, or capital expenditure the existing CON is void, and a new CON application is required before the proponent can lawfully proceed further." CON Review Manual § 100.01 at 54.[21]

¶33. "Due process always stands as a constitutionally grounded procedural safety net in administrative hearings." *McGowan II*, 604 So. 2d at 318 (citations omitted). However, "[t]he due process clauses of our constitutions must not be construed so as to put the state and federal governments into a straight-jacket and prevent them from adapting life to the continuous change in social and economic conditions." *Miss. Power Co. v. Goudy*, 459 So. 2d 257, 273 (Miss. 1984) (Hawkins, J., specially concurring) (quoting *Albritton v. City of Winona*, 181 Miss. 75, 178 So. 799 (1938)).[22] In the administrative setting, "minimum

_____

[21]As to route amendments, the State Health Plan provides:

[a]n *equipment vendor* who proposes to add a health care facility to an existing or proposed route must obtain *an amendment* to the original Certificate of Need before providing such service. Additionally, an *equipment vendor* must inform the [MSDH] of any proposed changes, i.e. additional health care facilities or route deviations from those presented in the Certificate of Need application prior to such change.

State Health Plan at XI-45 (emphasis added). This Court finds this provision inapplicable here as the "equipment vendor" is Alliance, not DeSoto.

[22]For instance, "the failure of an agency to follow its own regulations is not per se a denial of procedural due process." *Woodard v. Los Fresnos Indep. Sch. Dist.*, 732 F. 2d

procedural due process . . . is (1) notice, and (2) opportunity to be heard." *State Oil & Gas Bd. v. McGowan*, 542 So. 2d 244, 248 (Miss. 1989) ("*McGowan I*") (citations omitted).

¶34.    The "great deference" extended to the MSDH, *Buelow*, 757 So. 2d at 219, reaches to the "new and unforeseen problems" it encounters over time. *Daniel*, 439 U.S. at 566.  There can be no legitimate dispute that the procedures outlined in Mississippi Code Annotated Section 41-7-197(1) were satisfied with respect to DeSoto's application.  Following a route change, which was not a substantial change in scope and which would have required a new CON application had CON Review Manual § 100.01 been applicable, a hearing was held to consider Baptist and Carvel's "Joint Motion to Reopen and Supplement Record and for Reconsideration of Hearing Officer's Findings of Fact and Conclusions of Law." Significantly, no parties to the proceeding, no health care facilities in the same health care service area, and no others originally noticed, appeared to request a new hearing.

¶35.    Procedurally, this Court finds that given the absence of a request for a hearing, the due process contention of Baptist and Carvel is much ado over nothing, the proverbial "red herring."   Addressing the due process argument substantively, this Court finds the administrative procedural due process requirements of "(1) notice, and (2) opportunity to be heard[,]" *McGowan I*, 542 So. 2d at 248, were satisfied.  Baptist and Carvel were on notice of the new route.  A motion hearing on Baptist and Carvel's "Joint Motion to Reopen and Supplement Record and for Reconsideration of Hearing Officer's Findings of Fact and Conclusions of Law" accorded them due process.  Had any other individual or entity entitled

---

1243, 1245 (5th Cir. 1984) (citing *United States v. Caceres*, 440 U.S. 741, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979)).

to notice sought intervention in the proceeding at any stage complaining a lack of due process, the chancellor might have been required to undertake a separate due process analysis. However, no such claim was advanced. Finally, at the post-hearing motion proceeding, Smith's sworn affidavit provided substantial evidence, i.e., "more than a scintilla or a suspicion[,]" ***Natchez Cmty. Hosp.***, 743 So. 2d at 977, that a new route would meet the need requirements of the State Health Plan. This Court finds that this sworn statement of Alliance's Director of Operations is more than a mere "factual allegation," thereby rendering the contested portion of subsection (2) inapplicable. The issue of import to satisfy the requirements of the State Health Plan is not the specific route, but rather the number of procedures. Whether considering evidence based upon the previous twelve-month period (the historical number of procedures performed) or the proposed route change (the formula projection), the result is the same. The minimum number of procedures required was met.[23]

¶36.    While this Court commends the chancellor's careful examination of all issues, the chancellor erroneously granted relief which was not sought by the parties to the agency proceeding, i.e., a new hearing. Additionally, the applicable standard of review renders this a matter of deference, not equity. Accordingly, this Court defers to the judgment of the MSDH. Therefore, this Court concludes that the chancery court erred in remanding to the MSDH.

---

[23]Had the evidence proffered been admitted, the result would be the same. Therefore, even if there was error, it was harmless, as the result remains unchanged.

28

## CONCLUSION

¶37.    Based upon the aforementioned analysis, this Court reverses the Chancery Court of Hinds County and affirms the decision of the MSDH in granting the CON.

¶38.    **REVERSED AND RENDERED.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**