# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-CC-01077-SCT

*QUEEN CITY NURSING CENTER, INC.,*
*COMMUNITY LIVING CENTERS, LLC d/b/a*
*MERIDIAN COMMUNITY LIVING CENTER, AND*
*BEVERLY ENTERPRISES-MISSISSIPPI, INC.*
*d/b/a GOLDEN LIVING CENTER-MERIDIAN*

*v.*

*MISSISSIPPI STATE DEPARTMENT OF*
*HEALTH AND MEADOWBROOK HEALTH AND*
*REHAB, LLC*


| | |
|---|---|
| DATE OF JUDGMENT: | 06/10/2010 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | THOMAS L. KIRKLAND, JR. |
| | ALLISON C. SIMPSON |
| | ANDY LOWRY |
| ATTORNEYS FOR APPELLEES: | BEA M. TOLSDORF |
| | BETTY TOON COLLINS |
| | DOUGLAS E. LEVANWAY |
| | ELIZABETH G. HOOPER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 12/01/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE DICKINSON, P.J., LAMAR AND KITCHENS, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     Meadowbrook Health and Rehab, LLC, filed an application for a certificate of need

("CON") with the Mississippi Department of Health ("DOH") to build a nursing home in

Lauderdale County. The DOH staff recommended that the application be approved. Several surrounding nursing homes contested the application and requested a hearing. After three days of testimony, the hearing officer recommended that the application be denied. But the State Health Officer ("SHO") disagreed and granted the CON. The contestants appealed to the Hinds County Chancery Court, which affirmed the SHO's decision. The contestants now appeal to this Court, arguing that the SHO's decision is arbitrary and capricious and that the CON violates the statutory moratorium on new nursing home construction. We affirm the Hinds County Chancery Court.

## FACTS AND PROCEDURAL HISTORY

¶2. In January 2009, Meadowbrook applied to the DOH for a CON[1] to construct a sixty-bed nursing home facility in Lauderdale County. The facility was to be a "replacement facility" for a Kemper County nursing home – Kemper Homeplace – which had contained twenty-one beds before it was closed.[2] Bruce Kelly – the owner of Meadowbrook and

---

[1]Mississippi Code Section 41-7-191 states, in pertinent part:

"(1) No person shall engage in any of the following activities without obtaining the required certificate of need:
. . .     (b) The relocation of a health care facility or portion thereof, or major medical equipment, unless such relocation of a health care facility or portion thereof . . . is within five thousand two hundred eighty (5,280) feet from the main entrance of the health care facility . . . . "

Miss. Code Ann. § 41-7-191 (Rev. 2009).

[2]In November 2005, the DOH Division of Licensure and Certification had determined that the Kemper Homeplace residents were in "immediate jeopardy." All of the residents were relocated, and Kemper Homeplace closed in January 2006. The owner of Kemper Homeplace sold the beds to Bruce Kelly – the owner of Meadowbrook and Poplar Springs Nursing Home. In March 2007, Kelly placed the beds in "abeyance." Kelly subsequently formed Meadowbrook as the replacement entity for Kemper Homeplace.

2

another Lauderdale County nursing home, Poplar Springs – also planned to relocate thirty-nine beds from Poplar Springs to Meadowbrook to fulfill the DOH's requirement that no new nursing home facility be opened with fewer than sixty beds.[3]

¶3.    The DOH staff conducted a review and in April 2009 recommended that the application be approved. Specifically, the staff review concluded that:

> The project is in substantial compliance with the overall objectives as contained in the FY 2009 State Health Plan; the Mississippi Certificate of Need Review Manual, revised 2008; and all adopted rules, procedures, and plans of the Mississippi State Department of Health. The Division of Health Planning and Resource Development recommends approval of this application submitted by Meadowbrook Health and Rehab, LLC for replacement of the Kemper County Nursing Home and Relocation of 39 Nursing Facility Beds from [Poplar] Springs Nursing and Rehab to [the] Northpointe Health & Rehab[4] project in Lauderdale County.

Several surrounding Lauderdale County nursing homes – Queen City Nursing Center, Meridian Community Living Center and Golden Living Center ("contestants") – opposed the application and timely requested a hearing, as "affected persons" under the governing statute. *See* Miss. Code Ann. § 41-7-197 (Rev. 2009).

¶4.    At a three-day hearing in September 2009, the designated hearing officer heard evidence presented by the DOH, Meadowbrook, and the contestants. After review, the hearing officer issued her findings, disagreeing with the DOH staff analysis and recommending that Meadowbrook's CON application be denied. The hearing officer found

---

[3]Section 106.01 of the Mississippi State Health Plan states, in pertinent part: "The [DOH] shall not approve construction of a new or replacement nursing home care facility for less than 60 beds." Miss. State Health Plan, Ch. 8, § 106.01(6) (2009), *available at* http://msdh.ms.gov/msdhsite/index.cfm/19,2945,184,455,pdf/StateHealthPlan2009Complete.pdf (last visited Nov. 10, 2011).

[4]Kelly intended to name the new facility "Northpointe Health & Rehab."

that the application was "not in substantial compliance" with the relevant rules, regulations and statutes, that the DOH staff analysis was "incorrect in its findings," and that the application should be disapproved by the SHO. But the SHO disagreed with the hearing officer and issued a final order approving Meadowbrook's application.[5] The SHO found that the application was "in substantial compliance with the State Health Plan and General Review Criteria found in the Certificate of Need Review Manual," and she stated that she "concur[red] with and adopt[ed] the [DOH] staff's findings and recommendation."

¶5.     The contestants timely appealed to the Hinds County Chancery Court, which affirmed the SHO's decision. The chancellor found that the SHO's decision "was supported by substantial evidence, was not contrary to the manifest weight of the evidence, was not in excess of the statutory authority or jurisdiction of the [DOH], and did not violate any vested constitutional rights of any party involved in the appeal." The contestants now appeal to this Court, arguing that:

> (1) this Court should apply a heightened standard of review because the SHO merely "adopted a staff analysis" with no explanation and no separate opinion; and that this Court should grant the DOH no deference in its

---

[5] Section 41-7-197(2) of the Mississippi Code gives the SHO the sole authority to grant or deny CONs following the hearing and states, in pertinent part:

*The completed record shall be certified to the State Health Officer, who shall consider only the record in making his decision, and shall not consider any evidence or material which is not included therein. All final decisions regarding the issuance of a certificate of need shall be made by the State Health Officer.* The State Health Officer shall make his written findings and issue his order after reviewing said record.

Miss. Code Ann. § 41-7-197 (2) (Rev. 2009) (emphasis added).

4

interpretation of the moratorium on new nursing home construction because it "farmed out" the interpretation of that law to the Attorney General's Office;[6]

     (2) it was arbitrary and capricious for the SHO to grant the CON when there was "no evidence that the [DOH's] need policy was met";

     (3) it was arbitrary and capricious for the SHO to grant the CON when there was no evidence that Meadowbrook considered available alternatives, met the State Health Plan's objectives, or proved economic viability; and

     (4) the application does not fall within one of the exceptions to the moratorium on new nursing home construction enumerated by the Attorney General; or, in the alternative, the Attorney General's interpretation of the moratorium violates the plain language of the statute.

We disagree with the contestants and find that the chancellor correctly ruled that the SHO's decision to grant the CON was supported by substantial evidence and thus was not arbitrary and capricious. And although neither the staff analysis nor the SHO discussed the statutory moratorium on new nursing home construction,[7] we find that the DOH's interpretation of the moratorium is not "repugnant" to the plain meaning of the statute, and we agree with its interpretation.

## ANALYSIS

### I.    *The SHO's decision that there was a need for the Meadowbrook Project was not arbitrary and capricious.*

#### A.  *Standard of Review*

¶6.    Section 41-7-201(2)(f) of the Mississippi Code sets forth the standard of judicial review for a final order of the DOH and provides that it shall be vacated only upon an error

---

[6]We address the contestants' standard-of-review arguments in the relevant sections.

[7]*See* Miss. Code Ann. § 41-7-191(2) (Rev. 2009): "The State Department of Health shall not grant approval for or issue a certificate of need to any person proposing the new construction of, addition to, or expansion of any health care facility . . . ."

5

of law, or if the order "is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction . . . or violates any vested constitutional rights of any party involved in the appeal."[8]

¶7.    "If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious." *Miss. State Dep't of Health v. Natchez Cmty. Hosp.*, 743 So. 2d 973, 977 (Miss. 1999). "An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone." *Id.* "An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." *Id.*

¶8.    As administrative agencies are given much deference, "the burden of proof rests on the challenging party to prove that the department erred." *Greenwood Leflore Hosp. v. Miss. State Dep't of Health*, 980 So. 2d 931, 934 (Miss. 2008). And "the same deference due the

---

[8] The contestants urge this Court to apply a heightened standard of review, because the SHO "rejected" the hearing officer's recommendation "without making any independent findings or explanation of her own." But we find that their argument is contradicted by the plain language of Section 41-7-197(2), which states, in pertinent part:

> The completed record shall be certified to the State Health Officer, who shall consider only the record in making his decision, and shall not consider any evidence or material which is not included therein. All final decisions regarding the issuance of a certificate of need shall be made by the State Health Officer. The State Health Officer shall make his written findings and issue his order after reviewing said record.

Miss. Code Ann. § 41-7-197(2) (Rev. 2009). Nowhere in the statute is the SHO required to defer to the findings of the hearing officer, nor is she required to "explain" her reasons for disagreeing with the hearing officer. She is required only to review the entire record, issue an order, and make her written findings, all of which she did in this case.

6

department's finding must also be given to the chancellor who, on appeal, affirms and adopts the department's finding." *Id.*

¶9. In sum, we will neither reweigh the evidence nor conduct a de novo review of contested facts. Rather, our review is limited to whether substantial evidence existed to support the SHO's decision.

### B. Analysis

¶10. Kelly's proposal would establish a sixty-bed facility in Lauderdale County by relocating thirty-nine beds from Poplar Springs (a Lauderdale County facility) and replacing the twenty-one beds from the closed Kemper County facility. In other words, no new beds would be established, but the twenty-one beds that had been held in abeyance for two years would be reestablished. The contestants argue that the SHO's decision to grant the CON was arbitrary and capricious because there was no substantial evidence of General Review Criterion 5 – Need for the Project.[9] We therefore examine the record to determine whether substantial evidence exists to support the SHO's conclusion that there was a need for the Meadowbrook project.

---

[9]One of the general criteria used to evaluate a CON application is "Need for the Project." Under that criterion, several items "may be considered" to determine whether a need for the project exists. Pertinent here is item (a), which states:

> The need that the population served or to be served has for the services proposed to be offered or expanded and the extent to which all residents of the area – in particular low income persons, racial and ethnic minorities, women, handicapped persons and other underserved groups, and the elderly – are likely to have access to those services.

15-991-8 Miss. Code R. § 100.01(5)(a) (Weil 2011), *available at* http://msdh.ms.gov/msdhsite/_static/resources/3346.pdf (Last visited Nov. 30, 2011).

7

¶11.    Don Eicher, the Director of the Office of Health Policy and Planning at the DOH, testified that there was a need for 738 beds in Long-Term Planning District IV, which includes both Lauderdale and Kemper Counties.[10]  He testified that Lauderdale County contained 572 licensed beds, but had a need for 591, for a total of nineteen needed beds. Eicher testified that:

> The other part and principle is that there's a greater bed need in the county where it's being moved to . . . Kemper County, the 2009 State Health Plan shows a need for two beds, as opposed to Lauderdale having a need of 19. And, therefore, you're moving from having less need to a county that has greater need.  So that's our other principle that we wouldn't allow you to move the other direction.  If you were moving from Lauderdale to Kemper, you would not be recommended for approval because you are moving from a county with a higher need to one that has a lesser need.

¶12.    Meadowbrook also presented testimony from Dan Sullivan, who was accepted as an expert in "healthcare planning, healthcare financial projections and CON preparations." Sullivan testified that if the twenty-one Kemper County beds held in abeyance were not used within five years, they would be "lost to the system"[11] because of the moratorium, and that

---

[10]Eicher's figures were based on the 2009 State Health Plan, which was the plan in effect at the time Meadowbrook's CON application was filed.

[11]Sullivan was referring to  Mississippi Code Section 41-7-191 which states, in pertinent part:

> (1) No person shall engage in any of the following activities without obtaining the required certificate of need:
>
>         (a) The construction, development or other establishment of a new health care facility, *which establishment shall include the reopening of a health care facility that has ceased to operate for a period of sixty (60) months or more* . . . .

Miss. Code Ann. § 41-7-191(1)(a) (Rev. 2009).

8

"from a health planning perspective," that "would be something we don't want to see happen." And, based on his calculations, "there ought to be significantly more demand over the next five years for nursing home beds in Lauderdale County and having that additional twenty-one bed capacity available should be beneficial," and that "it would take us almost 20 years to generate enough incremental need to support 39 additional beds[12] in Kemper County."

¶13. Sullivan also gave his opinion about whether the twenty-one beds should stay in Kemper County or be relocated to Lauderdale County:

> So clearly, then, looking at this, in terms of where you'd end up, from a county-by-county perspective, you would create a more disproportionate need in Lauderdale County if you moved 39 beds to Kemper than you would – in Kemper County, if you moved 21 beds to Lauderdale . . . . If the project is not approved, we're still going to have a need for 23 beds in Kemper County because those beds are going to go out of existence. So it's almost a given that we're going to end up with a bed need of 23 in Kemper County. And then the question is: Do we try to solve that by moving 39 beds over, or do we move those beds into Lauderdale County? . . . *So, whether you are using 572 beds or 602 beds, you're still better off from a net bed need standpoint in moving the beds to Lauderdale County*.

(Emphasis added.) Sullivan testified that the need criteria is based on *district*-wide planning, not county-wide planning, and that the district encompassing Lauderdale and Kemper Counties needed more than 700 beds. Additionally, the administrators of the three contesting nursing homes testified that, during the last couple of years, their occupancy rates had been at ninety-five percent or above. And finally, as discussed above, while the staff analysis conceded that moving the twenty-one beds into Lauderdale County would leave Kemper

---

[12]Sullivan was referring to the thirty-nine Poplar Springs beds that Kelly planned to relocate.

County underbedded by twenty-three and Lauderdale County overbedded by two, it also noted that the alternative – leaving the twenty-one in Kemper County and relocating the thirty-nine Poplar Springs beds there – would leave Lauderdale County underbedded by fifty-eight.

¶14. After reviewing the record, and without further belaboring this opinion, we find that substantial evidence exists to support the SHO's finding that there is a need for the Meadowbrook project. So it cannot be said that her decision was arbitrary and capricious, as it was not reached on "will alone," or through "a lack of understanding of or disregard for the surrounding facts." *Natchez Cmty. Hosp.*, 743 So. 2d at 977.

## II. The SHO's decision that the Meadowbrook Project met other relevant criteria was not arbitrary and capricious.

¶15. The contestants next argue that Meadowbrook also failed to satisfy other criteria – specifically, that it failed to consider available alternatives, failed to conform to the State Health Plan's goals, and failed to prove financial feasability.

### A. Availability of Alternatives

¶16. The contestants argue that Meadowbrook did not provide evidence of General Criterion 3– Availability of Alternatives.[13] They point out that Bruce Kelly, the owner of Meadowbrook and Poplar Springs, testified that he bought the Kemper County beds without ever considering placing them at Poplar Springs. Kelly also testified that he did not obtain

---

[13]General Criterion 3 is the "Availability of Alternatives: The availability of less costly or more effective alternative methods of providing the service to be offered, expanded or relocated." 15-991-8 Miss. Code R. § 100.01(3) (2011), *available at* http://msdh.ms.gov/msdhsite/_static/resources/3346.pdf (last visited Nov. 30, 2011).

any architectural estimates for adding the twenty-one beds to his existing Poplar Springs facility. So, the contestants argue, there was "no substantial evidence that adding the twenty-one beds at Poplar Springs would not be 'less costly.'"

¶17.   Although Kelly did state at one point that he did not consider placing the beds at Poplar Springs, his testimony as a whole shows that he *did* consider that option, but then rejected it:

> And the thought never really entered my mind to put them at Poplar Springs. At the time, I did not own the property adjacent to [Poplar Springs]. Since then, I've acquired about 34 acres around the facility. But, initially, I did not own that land . . . . I really don't like to do things halfway, and it's been a passion of mine as an owner to provide private rooms[14] for our patients . . . . So, with that in mind, my whole intent was to never really put them at [the] Poplar Springs location because we have a huge facility now, and it might would [sic] have accommodated, you know these people with some building, you know, alterations. We really didn't spend a lot of time looking at that due to the fact that I believe our patient[s], Medicare, the poor, are entitled to a private room, just like the ones that can pay their way. So that's just been a passion of mine . . . I have done renovations, and we have a renovation now. And, you now, it's very traumatic for the patients . . . It's just traumatic on the residents if their routine is upsetted [sic] . . . .

Kelly also testified that he decided not to simply replace Kemper Homeplace in Kemper County because "[a]fter talking to the state agency people, it was not a doable project because you have to build 60 beds or replace twenty-one, which is not viable . . . [y]ou know, twenty-one beds is not, you now, going to survive economically." The CON application also reflects that these options were considered and rejected.

_____

[14]Kelly plans for his new facility to have sixty private rooms. And after the thirty-nine beds are relocated from Poplar Springs, Poplar Springs will have sixty-nine private rooms and eleven semi-private rooms.

11

¶18. Dan Sullivan testified that he also had considered alternatives in his review of Meadowbrook's application. The first option was simply to do nothing – Sullivan dismissed that idea, stating "[w]ith the demographic changes that are occurring in the population, there's going to be more demand for nursing home beds in the future," and "[i]t would be a shame to lose any bed capacity when there's no ability to recapture that bed capacity down the road." Sullivan also considered adding the twenty-one beds to Poplar Springs, but dismissed that option as well, stating:

> [I]t doesn't accomplish some of the other goals that the project could do in a freestanding building . . . . What you would be doing is decreasing the number of private rooms because you would have to basically shoehorn these beds into an existing 130-bed facility and create a 151-bed facility. And so what you'd be doing is diminishing the quality of life at the existing facility . . . .

We find that substantial evidence exists to support a finding that no better alternatives were available. Although adding the beds to Poplar Springs might ultimately have been "less costly," testimony was presented that this option was not a "*more effective* alternative method."

## B. *Conformity to the State Health Plan Goals*

¶19. General Criterion 1 considers "the relationship of the health services being reviewed to the applicable State Health Plan." The Health Plan states that Mississippi's planning and health regulatory activities have four purposes:

1. To improve the health of Mississippi residents;
2. To increase the accessibility, acceptability, continuity and quality of health services;
3. To prevent unnecessary duplication of health resources; and
4. To provide some cost containment.

12

Miss. State Health Plan, Ch. 1, § 102 (2009), *available at* http://msdh.ms.gov/msdhsite/index.cfm/19,2945,184,455,pdf/StateHealthPlan2009Complete.pdf (last visited Nov. 30, 2011). The contestants argue that Meadowbrook has failed to demonstrate how its application advances these goals, because the new facility was an unnecessary duplication, the Division of Medicaid opposed the project, and moving beds out of underbedded Kemper County does not improve access for Kemper County citizens.

*1. Improve Health and Increase Accessibility to Health Services[15]*

¶20.    Meadowbrook's application states that its new facility would "allow those in need of nursing home care to reside in as pleasant and homelike a setting as possible with private rooms and large spacious areas for daytime activities." Both Bruce Kelly and Dan Sullivan testified that the trend in the nursing home industry was to provide nursing home residents with privacy and dignity. There also was testimony that relocating Kemper Homeplace to Lauderdale County would greatly improve the residents' access to acute-care hospitals.

*2. Prevent Unnecessary Duplication*

¶21.    Meadowbrook noted in its application that its project furthers this goal because "there are no new nursing home beds that are being added to the State." And when asked whether the project would unnecessarily duplicate existing services, Dan Sullivan testified:

> It does not. First of all, it's not increasing the bed capacity. And you're probably tired of me [sic] hearing me say that . . . . You know, we know we have to replace the twenty-one beds or lose them. And we know we have to build a 60-bed facility in order to accommodate those beds or, as I said before, put them in another facility and make a larger institution-type facility. So I don't believe it's unnecessary duplication when you create a facility that's

_____

[15]We discuss these two considerations together because they are so closely intertwined.

13

more desirable from a patient care standpoint, from a quality of life standpoint, and doesn't result in any increase in beds.

### 3. Provide Some Cost-Containment

¶22. Meadowbrook noted in its application that the relocation of the twenty-one beds furthers this goal because "such replacement of a twenty-one-bed facility with a 60-bed facility allows economies of scale in operation." And the staff analysis noted that Meadowbrook's projected construction costs were within the median range for construction of a nursing home. Don Eicher testified that the alternative chosen by the applicant does not have to be the cheapest. And Dan Sullivan testified that the project provided some cost containment, noting that "cost containment doesn't mean choosing the cheapest alternative," and that cost containment "means providing an expenditure that achieves stated goals, and it's still in the most economical manner."

¶23. Medicaid did oppose the project, claiming that the new facility would cost it $1,157,850 annually. But Meadowbrook presented evidence at the hearing that the actual cost to Medicaid would be much lower. Shane Hariel, who was accepted as an expert in healthcare and nursing home finance, testified that the "lion's share of that amount is simply due to the twenty-one beds re-entering service." Hariel also testified that, if all factors were taken into account, such as patient responsibility payments, bed taxes, and matching federal funds, the actual cost to Medicaid would be $189,877.

¶24. We find that substantial evidence exists in the record from which the SHO could find that Meadowbrook's application substantially complied with the State Health Plan's goals.

### C. Financial Feasability

¶25.    The contestants claim lastly that Meadowbrook provided no evidence of General Criterion 4 – Economic Viability.[16]  The contestants argue that Meadowbrook never produced a cash-flow statement, did not include the cost of the twenty-one beds or the land on which the facility would be built in its capital-expenditure calculation,[17] and that its debt-service ratio was less than one.[18]

¶26.    The contestants' expert, Dr. John Hyde, testified that the new facility would not be financially feasible, while two of Meadowbrook's experts testified that it would be.  When asked his opinion about whether the new facility would be financially viable, Shane Hariel stated, "[b]ased on the assumptions that we utilized and that I'm comfortable with, I have no reason to believe that it would not be feasible."  And when asked if the facility would be profitable, Hariel testified:

> Yes . . . I go back to these are assumptions made.  Nobody can predict what's actually going to happen in the future, but they are reasonable assumptions, based on my work with other facilities.  And assuming that these assumptions do come to fruition, there's no reason that they can't be quite profitable.

---

[16]"Economic Viability: The immediate and long-term financial feasability of the proposal, as well as the probable effect of the proposal on the costs and charges for providing health services by the institution or service."  15-991-8 Miss. Code R. § 100.01(4) (Weil 2011), *available at* http://msdh.ms.gov/msdhsite/_static/resources/3346.pdf (last visited Nov. 30, 2011).

[17]Shane Hariel testified that both the Certificate of Need Review Manual and the staff analysis state that the cost of land is to be excluded when calculating the construction cost.

[18]Dr. John Hyde, the contestants' expert, testified that a debt-ratio of less than one means that "you're not making enough income to pay your debt."

15

Sullivan also testified that the project would be financially feasible, and that nothing he had heard from the contestants' expert, Dr. Hyde, "changed [his] opinion about that." We find that substantial evidence exists in the record from which the SHO could find that Meadowbrook's project demonstrated financial feasibility.

### III. The project does not violate Section 41-7-191(2) of the Mississippi Code.

¶27. The contestants argue alternatively that the SHO's decision to grant a CON to Meadowbrook violates Mississippi Code Section 41-7-191(2), which states, in pertinent part:

> The State Department of Health shall not grant approval for or issue a certificate of need to any person proposing the **new construction of, addition to, or expansion of** any health care facility defined in subparagraphs (iv) (skilled nursing facility)[19] . . . except as hereinafter authorized[20] . . .

Miss. Code Ann § 41-7-191 (2) (Rev. 2009) (emphasis added). The parties refer to this statute as the "moratorium," and the DOH has, since its passage in 1990, interpreted it to preclude only "new authorized beds and new facilities where none had previously existed." The DOH has "always viewed the relocation of existing beds or facilities and/or the replacement of such existing facilities with more modern amenities as outside the parameters of the moratorium." The DOH "does not interpret the moratorium to prohibit any and all construction when such construction is related to a skilled nursing facility."

¶28. This Court has:

---

[19] Section 41-7-173(h)(iv) defines "skilled nursing facility" as "an institution or a distinct part of an institution which is primarily engaged in providing to inpatients skilled nursing care and related services for patients who require medical or nursing care or rehabilitation services for the rehabilitation of injured, disabled or sick persons."

[20] The Legislature has since authorized many exceptions to the moratorium, but none is at issue in this case. *See* Miss. Code Ann. § 41-7-191(2)(a)-(t) (Rev. 2009).

16

generally accorded great deference to an administrative agency's construction of its own rules and regulations and the statutes under which it operates . . . . "an agency's interpretation of a regulation it has been authorized to promulgate is entitled to great deference and must be upheld unless it is so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

*Miss. State Dep't of Health v. Baptist Mem'l Hosp.*, 984 So. 2d 967, 981 (Miss. 2008) (citations omitted) (emphasis added). And "unless the Department's interpretation [of a statute] is repugnant to the plain meaning thereof, the court is to defer to the agency's interpretation." *Ricks v. Miss. State Dep't of Health*, 719 So. 2d 173, 179 (Miss. 1998) (citations omitted) (emphasis added). We also have ruled that "where an administrative agency's interpretation is contrary to the unambiguous terms or best reading of a statutory provision, the agency is not entitled to deference." *Sierra Club v. Miss. Envtl. Quality Permit Bd.*, 943 So. 2d 673, 679 (Miss. 2006) (citations omitted) (emphasis added).[21] However, we think it important to clarify what we mean by "deference" and "defer" as used in these cases, and in numerous other cases, discussing an agency's interpretation of its governing statutes. The ultimate authority and responsibility to interpret the law, including statutes, rests with this Court. But in determining the most reasonable and appropriate

---

[21]The DOH previously requested an opinion from the Attorney General, asking him to opine on its interpretation of the moratorium. The contestants urge this Court to grant no deference to that interpretation, because the DOH "punted the decision to the Attorney General's Office." First, we disagree that the DOH has "punted" the interpretation to the AG's Office, as the DOH states clearly in its brief that it had *been* interpreting the statute the same way that the AG ultimately interpreted it before it requested the opinion, and the contestants do not dispute that assertion. Second, and more importantly, this point is meritless in light of our discussion clarifying the consideration we give an agency's interpretation.

17

interpretation of a statute, the agency's interpretation is an important factor that usually warrants strong consideration. However, we do not defer to the agency's interpretation in the sense that we yield judgment or opinion.

¶29. Meadowbrook argues that, if the Legislature had "intended to apply the moratorium to the construction of replacement nursing homes and the relocation of existing nursing home beds, it would have included such language in the statute." Meadowbrook notes that, since 1990, the Legislature has passed numerous exceptions to the moratorium, each dealing with either the "creation of new never-before-authorized nursing home beds or the creation of new never-before authorized nursing homes."

¶30. The DOH agrees with Meadowbrook and argues that its project is not the "new construction" that the moratorium statute is designed to prohibit:

> Although the bricks and mortar Meadowbrook will use to construct the building will be new, the actual nursing home itself will not be considered new for health planning purposes in the State. It will *replace* a previously operating but still existing nursing home – Kemper. The beds which will be used for the provision of skilled nursing care at Meadowbrook will not be new, they will be currently existing beds – twenty-one previously authorized Kemper beds and 39 previously authorized Poplar Springs beds. This CON application does not involve the creation of new beds or the creation of any additional skilled nursing facility and thus the moratorium does not apply.

¶31. And we note the chancellor's order, in which he stated that the "Meadowbrook Application did not propose the '**new** construction of, addition to or expansion of' a skilled nursing facility; instead, the Application requested to **replace** the old, dilapidated building that formerly housed twenty-one existing beds comprising Kemper Homeplace and to **relocate** the Kemper beds and 39 Poplar Springs' beds to a new building . . . ."

18

¶32.    After review, we find that the DOH's interpretation is not "repugnant" to the plain meaning of the statute, nor is it "contrary" to its unambiguous terms, so we therefore find it to be a reasonable and appropriate interpretation. We now turn to whether Meadowbrook's project properly falls within the DOH's interpretation.

¶33.    As mentioned above, the DOH has "always interpreted the moratorium to be expressly prohibiting the increase of two things, new authorized beds and new facilities where none had previously existed," and it has "always viewed the relocation of existing beds or facilities and/or the replacement of such existing facilities with more modern amenities as outside the parameters of the moratorium."

¶34.    The contestants argue that Meadowbrook's project does not fall within this interpretation. They argue that Meadowbrook is not a "replacement" of an "existing" facility, because Kemper Homeplace does not "exist." They also argue that the project is not a "relocation" of an existing facility, as again, Kemper Homeplace does not exist, and Poplar Springs "means to continue doing business right where it is." We disagree.

¶35.    First, we find that Kemper Homeplace is still an "existing" facility for purposes of the CON process. The CON statute does not require a CON if a facility attempts to reopen within sixty months of ceasing to operate. *See* Miss. Code § 41-7-191(1)(a) (Rev. 2009).[22]

---

[22]"(1) No person shall engage in any of the following activities without obtaining the required certificate of need:

> (a) The construction, development or other establishment of a new health care facility, *which establishment shall include the reopening of a health care facility that has ceased to operate for a period of sixty (60) months or more*[.]"

Miss. Code Ann. § 41-7-191 (1) (a) (Rev. 2009).

19

And Don Eicher, the Director of the DOH's Office of Health Policy and Planning, clearly testified that:

> The Legislature amended the Certificate of Need law several years ago, and they required that any healthcare facility that's been closed or not provided service in 60 months or more be analyzed as a new facility. And so this facility will lose its – after 60 months of being closed and not providing any service, it would not be considered an existing facility. *So, despite this facility being closed for three-and-a-half years, it's still in existence under the Certificate of Need law until that 60-month threshold gets crossed.*

So we find that moving the twenty-one Kemper Homeplace beds to Meadowbrook's proposed facility is a "replacement" of an "existing healthcare facility," a project not prohibited by the moratorium under the DOH's interpretation. Second, we find that moving the thirty-nine beds from Poplar Springs to Meadowbrook's proposed facility is a "relocation," as defined by the DOH, as it clearly states that it has "always viewed the relocation of *existing beds*" as "outside the parameters of the moratorium."

## CONCLUSION

¶36. We find that the SHO's decision to grant Meadowbrook a CON was not arbitrary and capricious, as her decision was supported by substantial evidence. We find that the DOH's interpretation of the statutory moratorium is not "repugnant" to the plain meaning of the statute, and we agree with its interpretation. We also find that Meadowbrook's project falls within that interpretation. We therefore affirm the decisions of the SHO and the Hinds County Chancery Court.

20

¶37.   **AFFIRMED.**

**WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.**