# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-SA-01252-COA

**BAPTIST MEMORIAL HOSPITAL-NORTH MISSISSIPPI INC. D/B/A BAPTIST MEMORIAL HOSPITAL-NORTH MISSISSIPPI AND BMH NORTH MISSISSIPPI IMAGING SERVICES LLC D/B/A OXFORD DIAGNOSTIC CENTER**

**APPELLANTS**

v.

**MISSISSIPPI STATE DEPARTMENT OF HEALTH AND OXFORD PRE-OP & IMAGING CENTER LLC**

**APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/08/2017 |
| TRIAL JUDGE: | HON. WILLIAM H. SINGLETARY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANTS: | BARRY K. COCKRELL |
| ATTORNEYS FOR APPELLEES: | JEFFREY SCOTT MOORE STEVEN BLAKE ADAMS |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 10/23/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., GREENLEE AND TINDELL, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1.   Baptist Memorial Hospital-North Mississippi Inc. d/b/a Baptist Memorial Hospital-North Mississippi and BMH North Mississippi Imaging Services LLC d/b/a Oxford Diagnostic Center (collectively "Baptist") opposed Oxford Pre-Op & Imaging Center LLC's (OPIC) application for a Certificate of Need (CON) for magnetic resonance imaging (MRI) services.   The Mississippi State Department of Health (MSDH) later granted the CON.

Baptist appealed the MSDH's decision to the Hinds County Chancery Court, First Judicial District, and the chancery court affirmed the MSDH's grant of the CON.

¶2. Baptist now appeals to this Court, arguing that the chancery court erred when it affirmed the MSDH's decision, claiming that OPIC's CON application did not substantially comply with the 2015 State Health Plan (SHP). Specifically, Baptist contends that OPIC's application (1) did not meet the SHP's "Need Criterion"; (2) did not comply with the SHP's policy on utilization of existing MRI units; and (3) did not comply with the "General Review Criterion 4" regarding economic viability. Finding that the MSDH's decision to grant OPIC's CON application was supported by substantial evidence, we affirm.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

¶3. OPIC is a free-standing imaging center in Oxford, Lafayette County, Mississippi. Prior to receiving CON approval for MRI services, OPIC already offered pre-operative and imaging diagnostic services, including laboratory, x-ray, CT, and EKG services. On August 27, 2015, OPIC filed with the MSDH a notice of intent to apply for a CON to acquire MRI equipment and begin offering MRI services. OPIC then filed its CON application on February 22, 2016. In its application, OPIC proposed to lease a 1.5 Tesla MRI machine and to begin providing MRI services at its existing facility. OPIC also proposed to lease and renovate existing space adjacent to its imaging facility to accommodate the acquisition of the MRI unit. According to its CON application, OPIC's objective was to provide residents of Lafayette County and surrounding areas with "same day" MRI services to "alleviate the current unacceptably long waiting times to receive an MRI from facilities located in

Lafayette County."

¶4.    OPIC completed its CON application with the aid of health planning expert, Noel Falls, and Joe Repper, the Chief Financial Officer for North Mississippi Health Services Inc.—OPIC's joint-venture partner. Falls developed population-based statistical projections to show that OPIC would meet the SHP's "Need Criterion" required to obtain a CON for MRI services—a minimum threshold of 2,700 MRI procedures by the end of its second year of operation. Based on the population of OPIC's service area[1] and the MRI Use Rate,[2] Falls projected that OPIC would perform a total of 3,381 MRI procedures by the end of its second year. Additionally, OPIC supported its CON application with affidavits from physicians and nurse practitioners who projected they would collectively refer 3,288 procedures during OPIC's first year of operation and 3,996 procedures during its second year. Following an error correction, the projections were amended to reflect 3,120 procedures during OPIC's first year and 3,804 procedures during its second year. Thus, OPIC projected in its CON application that it would not only meet the 2700 procedure threshold but easily exceed it.

¶5.    At the time of OPIC's application, Baptist was the sole MRI provider in Oxford and Lafayette County, Mississippi. Baptist utilized two units: a 3.0 Tesla fixed-site unit at its hospital site (BMH-NM) and a 1.5 Tesla fixed-site unit at its diagnostic center (ODC). At

---

[1] OPIC defined its service area as the thirteen counties from which it was drawing approximately 90% of its patients for its already-offered pre-operative and imaging diagnostic services.

[2] Based on the 2015 SHP data, Mississippi's MRI use rate in 2013 was 86.27, meaning that a health planner could reasonably conclude that there will be 86.27 MRI scans per 1,000 individuals.

least as early as 2013, Baptist began to experience backlogs in MRI scheduling due to the increased demand for services. Patients' wait times for non-emergent MRIs routinely exceeded one week and at times were up to two weeks. To help alleviate the backlog and decrease wait times, Baptist extended its hours for services at both the BMH-NM and the ODC sites, reduced its appointment slots from 60 minutes to 45 minutes, and began opening the ODC on the weekends. Yet even with these efforts, Baptist was still unable to accommodate the demand for MRI services and reduce wait times. As a result, around November 2014, Baptist began making its own plans to add a third MRI unit in Oxford.

¶6.    In an email dated November 5, 2014, Peyton Warrington, BMH-NM's Chief Operating Officer, proposed two routes for adding a third MRI site: (1) relocating the hospital's 3T magnet to the ODC, relocating the ODC's 1.5T to the new hospital (then under construction) and adding an "Open Magnet" unit at the ODC, or (2) relocating the hospital's 3T magnet to the new hospital and purchasing a new 1.5T magnet for the new hospital. ODC's board of managers also discussed the need for a third MRI unit by potentially acquiring a second unit for the ODC. Board minutes from January 25, 2015 reflected that "Discussion of potential MRI strategy to be implemented over next several years was discussed. The need for both 3.0 MRI and a true open magnet was discussed."

¶7.    Baptist formalized its plans for adding a third MRI unit in Oxford in a document titled "Oxford Diagnostic Center: MRI Strategy." The MRI-strategy document stated that there were "currently 2 MRIs in the Oxford-Lafayette community" and that based on Baptist's research, it "believe[d] the community c[ould] support a third MRI." The document

4

acknowledged that "[t]he ability to accommodate a 3rd MRI in the community leaves the door open for another investor group/system to enter the market" and proposed a plan "[i]n order to avoid this scenario[.]" The strategy also included that "consideration should be given as to the need for a mobile [unit] during the interim in order to secure the slot for the 3rd MRI."

¶8. So, when Baptist learned of OPIC's notice of intent to seek a CON and enter Oxford/Lafayette County's market with a third MRI fixed-site unit, Baptist expedited its efforts to secure the third MRI slot in Oxford by acquiring a temporary, mobile MRI unit. The MSDH approved the utilization of a temporary, mobile MRI unit only until the construction of the new hospital in Oxford was completed.

¶9. On May 16, 2016, following a review and staff analysis of OPIC's CON application, the MSDH published its recommendation that OPIC's MRI project be approved. Baptist requested a public hearing on the application, which was held October 24 to 26, 2016, where Baptist opposed OPIC's CON application. All parties were represented by counsel and presented testimony and exhibits during the hearing. In a forty-six-page "Findings of Fact, Conclusions of Law and Recommendation," the MSDH hearing officer concluded that

> OPIC presented substantial and credible evidence in its CON Application and during the hearing that its project is in substantial compliance with the 2015 SHP standards and criteria for the acquisition or control of MRI equipment and the offering of MRI services, as well as the general review criteria contained in the CON Review Manual. For these reasons, the Hearing Officer concurs with the Department's Staff Analysis and recommends that the State Health Officer approve OPIC's project.

¶10. On April 10, 2017, the MSDH issued its approval of OPIC's application, granting

5

OPIC a CON for MRI services. Baptist appealed the decision to the chancery court, which affirmed the MSDH's decision granting the CON. Baptist now appeals to this Court, and we address its issues in turn. Additional facts are discussed as relevant to the analysis.

**STANDARD OF REVIEW**

¶11. The judicial standard of review in an appeal from the MSDH's order granting or denying a CON is set forth by statute:

> The order shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal.

Miss. Code Ann. § 41-7-201(2)(f) (Supp. 2016).

¶12. "On appeal, we give great deference to [the] MSDH's decisions." *Baptist Mem'l Hosp.-DeSoto Inc. v. Miss. State Dep't of Health*, 214 So. 3d 277, 279 (¶3) (Miss. 2017). "A presumption of validity attaches to the MSDH's decision, . . . and this Court is limited to reviewing the lower court's decision to determine whether the record can support this finding." *Miss. State Dep't of Health v. Baptist Mem'l Hosp.-Desoto Inc*., 984 So. 2d 967, 975 (¶12) (Miss. 2008) (citation and internal quotation marks and citation omitted). We will affirm the MSDH's decision so long as it is supported by substantial evidence, even if the analysis or review is imperfect. *Baptist Mem'l Hosp.-DeSoto Inc.,* 214 So. 3d at 281 (¶14). "Substantial evidence means more than a scintilla or a suspicion." *Miss. State Dep't of Health*, 984 So. 2d at 974-75 n.13. "The burden of proof rests on the challenging party to prove that [the] MSDH erred." *Baptist Mem'l Hosp.-DeSoto Inc.*, 214 So. 3d at 281 (¶14).

6

**DISCUSSION**

¶13. Mississippi Code Section 41-7-193(1) (Supp. 2016) governs the grant of a CON. "The statute is clear that no CON shall be granted unless it has been 'reviewed for consistency with the specifications and criteria established by the State Department of Health and substantially complies with the projection of need as reported in the State Health Plan in effect at the time[.]'" *Baptist Mem'l Hosp.-DeSoto Inc.*, 214 So. 3d at 281 (¶12) (quoting § 41-7-193(1)). The 2015 SHP was in effect at the time of the OPIC's CON for MRI services and therefore applies to the instant case.

> **I.    SHP's Need Criterion**

¶14. Baptist's main argument on appeal is that OPIC did not meet the 2015 SHP's "Need Criterion" for the offering of MRI services. Specifically, Baptist states that OPIC failed to demonstrate that it would perform the requisite threshold number of MRIs required under the SHP because the projections cited by OPIC in the physician affidavits do not constitute substantial evidence.

¶15. Section 112.01.04 of the 2015 SHP states the following in regard to CON approval for MRI services:

> An entity proposing to offer MRI services shall obtain Certificate of Need (CON) approval before offering such services.
>
> > 1. Need Criterion: The entity desiring to offer MRI services must document that the equipment shall perform a minimum of 2,700 procedures (or 1,700 procedures for rural hospitals) by the end of the second year of operation. This criterion includes both fixed and mobile MRI equipment. The applicant must show methodology used for the projections.

7

a. Applicants for non-hospital based MRI facilities may submit affidavits from referring physicians. MRI procedures projected in affidavits shall be based on actual MRI procedures referred during the year.

b. The applicant shall document a reasonable population within its service area to justify 2,700 procedures per year per proposed MRI unit (1,700 procedures per year per proposed mobile MRI unit on a route exclusively serving rural hospitals).

¶16.    To comply with the SHP, OPIC was required to document that it would perform a minimum of 2,700 MRI procedures by the end of its second year of operation.  OPIC did so through physician affidavits and population-based statistical projections.  Baptist argues that the affidavits submitted by OPIC do not constitute substantial evidence because they are not accompanied or supported by actual medical records or other documented numerical data.  For this reason, Baptist alleges that OPIC's projections "were nothing more than unsupported estimates of the number of patients that the physicians might refer to OPIC for an MRI procedure" and therefore, are "in direct contravention of [the supreme court's] controlling decision in [*Mississippi State Department of Health v. Natchez Community Hospital*, 743 So. 2d 973 (Miss. 1999)]."

### A.    Physician Affidavits

¶17.    First, we note that the 2015 SHP allows projections in the form of physician affidavits as an optional means of meeting the need criterion.  *See* section 112.01.04 subsection (1)(a), stating that applicants "*may* submit affidavits from referring physicians."  Affidavits are not required, and they are not the only means for showing need.  Nevertheless, when utilizing

8

physician affidavits for support, the projections in the affidavits "*shall* be based on actual MRI procedures referred during the year," according to the SHP. The requirement that the affidavit projections be based on actual MRI procedures referred during the year is not synonymous with requiring the submission of medical records or other documented data. The SHP does not require or specify that such documents be submitted, and—contrary to Baptist's reading of *Natchez*—neither has our caselaw interpreted it to mean such.

¶18. Second, in regard to Baptist's reliance on *Natchez Community Hospital*, 743 So. 2d at 978 (¶26), in which the supreme court held that the projections in the physician affidavits were unsupported statements and did not constitute substantial evidence on which to grant a CON, the facts undergirding the supreme court's holding in *Natchez* are significantly different from those in this case.

¶19. In *Natchez*, the MSDH granted a CON to QSC, a surgical center, to establish a freestanding ambulatory surgery center. *Id*. at 975 (¶1). The SHP in effect at that time required QSC to show that it would perform 800 procedures per operating/procedure room each year. *Id*. at 977 (¶15). The MSDH's staff analysis recommended that the MSDH should *not* grant the CON to QSC. *Id*. at 975 (¶6). Natchez Community Hospital requested a public hearing, which was granted, and opposed QSC's application. *Id*. at (¶¶2-4). The hearing officer heard testimony from several of QSC's supporting physicians as well as physician letters and affidavits. *Id*.

¶20. In *Natchez*, QSC's owner, Dr. Arnold Feldman, had proposed in the application that QSC would perform 1,600 surgeries per year. *Id*. at 977 (¶17). He testified at the hearing

9

that his projection was based on the State's requirement that each operating room perform 800 procedures, and there were two operating rooms at QSC. *Id*. Dr. Feldman's projection was not based on facts but rather an unsupported, perfunctory recitation in an attempt to satisfy the CON requirements. *Id*. Further, Dr. Feldman testified that he would be the primary referring physician, speculating that he would personally perform 800-1,000 procedures, when records demonstrated he had only performed 322 the previous year, making his estimate wholly unrealistic. *Id*. at (¶18). Similarly, Dr. James Todd Jr. testified that he would perform 200 surgeries per year at QSC but then later testified that he had only performed 90 and 57 surgeries in the previous two years. *Id*. at 978 (¶19). He also stated that he would only utilize QSC for half of all his surgeries. *Id*. The supreme court noted that "taking Dr. Todd's information as true, . . . he would have to more than triple his current rate of surgery to meet his estimate." *Id*. at (¶20). The supreme court also noted that "Dr. Todd, in previous litigation, swore under oath that he was permanently and totally disabled and that he had severe difficulties in performing even the simplest tasks. This further casts doubt on the ability of Dr. Todd to triple his current rate of surgery." *Id*. at (¶21).

¶21. In *Natchez*, another physician, Dr. Richard Meyers Jr., testified that he would transfer 350-500 cases to QSC from his office and the hospital where he operated, yet actual records showed he had only performed 165 and 119 procedures in the preceding two years and 130 procedures in 1995, 119 procedures in 1996, and 130 procedures in the first ten months of the then-current year. *Id*. at (¶23). He "then changed his testimony to state that he would probably only transfer 100 cases to the [QSC]." *Id*. Likewise, Dr. Bernadette Sherman,

10

without evidence to support her projection, stated in her affidavit that she would use the QSC for over 100 cases per year, yet actual records showed she had only performed 21 total procedures the year of QSC's application. *Id*. at (¶24). Dr. Frank Guerdon stated he would perform between 50 and 100 procedures at QSC, but records showed he had performed only 51 procedures that year. *Id*. at (¶25). Dr. Alphonse Reed estimated he would use QSC for 100 or more procedures, though he had only performed 11 that year. *Id*.

¶22. Thus, in *Natchez*, it was undeniably clear that the physician estimates projected in the CON application and accompanying affidavits had—as the supreme court stated—"no factual basis," were "contradicted by the actual numbers of procedures these physicians have performed in the past," and "appeared to be pure speculation." *Id*. at 978-79 (¶¶26, 28). Based on these specific facts, the supreme court affirmed the chancery court's reversal of the order granting the CON and held that "unsupported statements by physicians do not provide substantial evidence upon which the Department should grant a CON." *Id*. at (¶28). While clear that unsupported statements do not constitute substantial evidence, *Natchez* did not hold that physician affidavits require the submission of medical records to constitute substantial evidence. Neither does the 2015 SHP—only that the projections in the affidavits "be based on actual MRI procedures referred during the year," as provided in section 112.01.04(1)(a).

¶23. In the present case, the hearing officer found that OPIC's physician-affidavit projections were based on actual MRI procedures referred during the year. Each of OPIC's supporting physicians' affidavits stated that its projections were based on "records and historical referral patterns." By supplemental affidavits and testimony at the hearing, the

11

referring physicians stated that while some of their practices did have electronic medical records, their systems were not capable of tracking the number of MRIs referred. As such, the testimony reflected that the referral projections were based on the provider's knowledge of current referrals, historical referral patterns, recollection of the medical records that were generated contemporaneous with each patient contact, MRI orders that were pending completion, consultation with their scheduling assistants, and so on. As such, the projections cited in the CON application were based on actual MRI procedures referred during the year.

¶24. Baptist also argues that the projections in the affidavits were contradicted by the actual number of MRIs referred by the OPIC-supporting physicians. Baptist's health-planning expert, Dan Sullivan, contended that OPIC's supporting physicians had only referred approximately 2,000 procedures on an annualized basis in 2016. However, the hearing officer rejected Baptist's evidence as conflicting and incredible.

¶25. During discovery prior to the hearing, OPIC issued a subpoena to Baptist requesting all documents that identified the "ordering or referring physician, payor, date of service, and patient origin data of all patients who received MRI services from Baptist from 2013-2016 year to date" for both the ODC and BMH-NM MRI sites. Baptist produced an initial set of spreadsheets—one for the ODC and another for BMH-NM, but the spreadsheets did not include the referring provider information. OPIC protested that this production did not comply with its subpoena, and Baptist agreed to provide the data. Baptist produced a second set of spreadsheets with the referring provider information, but the number of MRIs reflected in the second data set contained significantly fewer MRIs than the first data set. As the

12

hearing officer noted, without explanation, "over 1[,]000 procedures disappeared" from the first data set to the second data set for both 2015 and 2016. As such, the hearing officer concluded that Baptist's and Sullivan's estimates of the number of MRI procedures historically referred by OPIC's Supporting Practitioners for the purposes of rebuttal were "based entirely on deeply flawed data" and further found that Baptist failed to provide a satisfactory explanation for the discrepancies between the two data sets which were, according to the hearing officer, "completely irreconcilable." Accordingly, OPIC's physician-affidavit projections were based on actual MRI referrals during the year, and Baptist did not rebut this showing.

### B.    Population-Based Statistical Projections

¶26.    OPIC also presented evidence that it would meet the need criterion through a population-based, market-share analysis. Falls projected that based on the population of OPIC's service area, OPIC would perform between 3,075 total MRIs for the second year utilizing a conservative market-share percentage, and 3,426 total MRIs for the second year when utilizing a slightly higher market-share percentage. These market-share percentages were based on Baptist's market-share at BMH-NM and the ODC. Falls, who was not at all involved with the physician-affidavit projections, testified that the two methods served as a cross-check of each other. Falls opined that in this case, the physician-affidavit projections and the population-based projection cross-checked each other very well because the numbers demonstrated in the two methods were closely reflective of the other.

### C.    Additional Evidence of Need

¶27. In addition to OPIC's physician-affidavit and population-based projections, the hearing officer found that there was other evidence supporting the need criterion. The hearing officer noted that Lafayette County was the fastest-growing county in Mississippi based on growth rates from 2010 to 2014 and that several of OPIC's referring providers testified that their practices—as well as the overall healthcare market in Oxford/Lafayette County—were experiencing sizable growth, noting this would further increase demand for MRIs. The hearing officer also recognized that Baptist's temporary, mobile MRI unit was performing 1,248 procedures per year on an annualized basis while only operating three days per week. The hearing officer stated that "Baptist's witnesses were unable to provide any meaningful response on how Baptist would handle the MRI workload currently being serviced by its temporary mobile unit after the new hospital is complete and the temporary mobile MRI unit is no longer in service." The hearing officer found that "Sullivan was evasive and equivocal when asked about Baptist's future plans for a second unit at the hospital." There was space designated in the new hospital's plans for a second MRI unit, although Baptist had only a CON for one unit at the hospital.

¶28. Most significantly, the hearing officer found that Baptist's own internal documents supported OPIC's CON application, specifically in regard to the need criterion:

> the most telling evidence of all is Baptist's own internal MRI strategy and planning documents which admits that the "community can support a third MRI" and the "door [is] open for another investor/group system to enter the market." In accordance with Baptist's strategy, it has already begun operating on a temporary-basis a third mobile MRI unit in an attempt to "secure the slot" for the third fixed-site unit. This unit, which is operating three (3) days a week and performing on average eight (8) procedures per day (annualized to 1,248 per year), *is strong evidence of the need for an additional, permanent fixed-site*

14

*unit in the Oxford community and further supports Mr. Falls' conclusion that the area can support an additional fixed-site MRI unit.* The two permanent MRI machines are already at full capacity. The temporary mobile unit currently being used at Baptist is performing a significant number of procedures, approximately 1,249 annualized.

¶29. We agree with the hearing officer that this evidence is especially telling. The hearing officer's decision that OPIC demonstrated that its proposal met the need criterion was supported by substantial evidence, including the physician-affidavits and population-based statistical projections. This issue is without merit.

## II. SHP's Utilization Policy

¶30. Baptist also argues that OPIC's CON application did not comply with the 2015 SHP's policy on utilization of existing MRI units. In section 12.01.01, the policy requires that no new MRI services should be approved unless "the proposed new services would not reduce the utilization of existing providers in the service area."

¶31. Baptist's expert, Sullivan, argued at the hearing that if OPIC's application was approved, it would result in a material reduction in utilization of MRI services by existing providers. Sullivan opined that "there's not going to be any material growth in the number of MRI procedures in the service area as a whole" and testified that "you've got a relatively fixed pie in terms of the number of procedures." Sullivan concluded that if OPIC achieved its projected volumes, it would "necessarily be at the expense of existing providers," in violation of the SHP's utilization policy.

¶32. In contrast, Falls testified that there was plenty of volume in the service area for OPIC to not only meet 2,700 MRIs by the end of OPIC's second year of operation but support the

15

projected 3,804 MRIs without having any impact on existing MRI providers. In fact, Falls testified that even with OPIC meeting its projection, there would still be an unmet need in OPIC's service area of between 8,386 and 10,487 procedures in 2019. Falls's estimations were based on data from the 2015 SHP and the United States Census Bureau. The 2015 SHP showed that there was a steady increase in the volume of MRI procedures being performed in the OPIC service area: 10,146 in 2009 to 12,404 in 2013—a growth rate of 11.5%. Falls explained that in 2013, according to the United States Census Bureau, Mississippi had an estimated population of 2,992,206 inhabitants; and, according to the 2015 SHP, there were 258,189 MRI procedures in Mississippi for 2013. Thus, in 2013, Mississippi's MRI Use Rate was 86.3 MRIs for every 1,000 Mississippians. Utilizing the MSDH's own population-based formula for the projection of MRI Service Volume, Falls estimated that there should have been approximately 25,132 MRI procedures performed in OPIC's defined service area during 2013. Using the MSDH's MRI Use Rate and MRI Service Volume formula, along with the 2015 SHP's 2020 population data, Falls estimated there should be 25,527 MRI procedures projected for OPIC's defined service area during 2020. As such, Falls testified that there was sufficient volume of needed MRIs in the defined service area to meet OPIC's projection of 3,804 without taking volume away from any of the existing units.

¶33. The hearing officer found OPIC's evidence on the issue more credible, stating "Mr. Falls [was] a more creditable witness on this issue than Mr. Sullivan." The hearing officer explicitly "reject[ed] Mr. Sullivan's assumption that 'there's not going to be any material

16

growth in the number of MRI procedures in the service area as a whole.'" The hearing officer found that Sullivan's conclusions were "contradicted by other substantial evidence in the case" and their basis "too limited in scope" by only looking at two years of data rather than the five years of data OPIC relied on. Further, the hearing officer found that the "volumes of MRI procedures being performed at Baptist-NM and the ODC in FYs 2015 and 2016 year to date also directly contradict Mr. Sullivan's assumption that there will be no growth in MRI procedure volumes in the service area."

¶34. We find that the MSDH's hearing officer's determination that the proposed new services would not reduce the utilization of existing providers in the service area was supported by substantial evidence. This issue is without merit.

### III. SHP's Economic Viability Requirement

¶35. In its final argument on appeal, Baptist contends that OPIC's CON application did not comply with the MSDH's General Review Criterion 4 on Economic Viability. Miss. State Dept. Health, CON Review Manual, Ch. 8.1.4. The CON Review Manual requires that CON applications be reviewed for economic viability, defined as "[t]he immediate and long-term financial feasibility of the proposal . . . ." Baptist contends that because OPIC's financial projections and economic viability assessment were based on the physician affidavits, and—as previously argued—the physician affidavits do not constitute substantial evidence, the affidavits cannot be used to project OPIC's revenue. Baptist further contends "[w]ithout evidence of revenue, it is legally impossible for OPIC to demonstrate economic viability of the proposed project as required by General Review Criterion 4."

17

¶36.   First, as previously addressed in this opinion, the hearing officer's determination that the physician affidavits constituted substantial evidence is affirmed.  Thus, Baptist's argument that the projected volume in the physician affidavits cannot serve in demonstrating economic viability fails.  Second and moreover, the hearing officer found that OPIC demonstrated its project was economically viable, and we agree there was substantial evidence to support this finding.

¶37.   During the hearing, OPIC's financial expert, Lynn Holland, testified regarding the economic viability of OPIC's proposal.  Utilizing OPIC's projected volumes, Holland conducted his own financial analysis of the project which showed that it would be profitable by the end of its second year, generating a net operating income of approximately $312,044. Holland testified that this estimate was actually a conservative estimate because it used low assumptions for net revenue per procedure when compared to similar imaging facilities. Based on even these conservative estimates, Holland testified that the project would be cash-flow positive at 2,085 procedures.  Holland also stated that even if OPIC only met the minimum volume of 2,700 procedures, the project would be economically viable with positive income and cash flow by the end of its second year.  Holland concluded that OPIC's proposed MRI project satisfied the criteria for economic viability.

¶38.   As such, the hearing officer's determination that OPIC's project was economically viable per the CON review criterion was supported by substantial evidence.  To dispute this finding, Baptist only offers its argument that OPIC's projections as stated in the physician affidavits are not substantial evidence—which the hearing officer, the chancery court, and

18

now this Court have rejected. This issue is without merit.

## CONCLUSION

¶39. Having reviewed the record, particularly the MSDH's hearing officer's extensive and detailed report, we find that OPIC "substantially complie[d] with the projection of need as reported in the state health plan in effect at the time . . . ." Miss. Code Ann. § 41-7-193(1). Additionally, Baptist has failed to show that MSDH's decision that OPIC substantially complied with the 2015 SHP was not based on substantial evidence, and thus fails to meet its burden. We find that there was substantial evidence to support the MSDH's decision, and therefore affirm MSDH's grant of a CON to OPIC to provide MRI services.

¶40. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**