# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2025-SA-00614-SCT

*SINGING RIVER HEALTH SYSTEM*

*v.*

*MISSISSIPPI STATE DEPARTMENT OF HEALTH AND JACKSON COUNTY HEART ASC, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/30/2025 |
| TRIAL JUDGE: | HON. TIFFANY PIAZZA GROVE |
| TRIAL COURT ATTORNEYS: | KATHRYN R. GILCHRIST |
| | BRANT J. RYAN |
| | ALEXANDRIA LYNN THORNTON |
| | AIDEN SETH DICKINSON |
| | CASSANDRA S. WALTER |
| | THOMAS L. KIRKLAND, JR. |
| | ALLISON C. SIMPSON |
| | MIMI L. SHUFELT |
| | CAROLINE CAMPBELL LOVELESS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | BRANT J. RYAN |
| | KATHRYN R. GILCHRIST |
| ATTORNEYS FOR APPELLEES: | THOMAS L. KIRKLAND, JR. |
| | KRISTI D. KENNEDY |
| | KRISTEN S. JONES |
| | ALLISON C. SIMPSON |
| | MIMI L. SHUFELT |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 01/22/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., GRIFFIS AND BRANNING, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. Singing River Health System (Singing River) appeals the Mississippi State Department of Health's (MSDH) approval of a certificate of need (CON) authorizing

Jackson County Heart ASC, LLC (JCH), to establish a joint venture cardiac ambulatory surgical facility (JV-CASF) in Gautier for the provision of cardiac catheterization services. Substantial evidence supports MSDH's approval of the CON. Accordingly, MSDH's decision is affirmed.

## FACTS AND PROCEDURAL HISTORY

¶2. Mississippi Code Section 41-7-191(1)(d)(ii) (Supp. 2025) requires that a CON be obtained before any person can engage in the offering of cardiac catheterization services. JCH filed a CON application with MSDH seeking to establish a JV-CASF in Gautier. A "CASF" is a cardiac ambulatory surgical facility "established and operated for the purpose of providing cardiac catheterization procedures." Miss. Dep't of Health, Div. of Health Plan. & Res. Dev., *FY 2022 Miss. State Health Plan* § 515.06(1)(a) (effective May 26, 2023), https://msdh.ms.gov/page/resources/16691.pdf. A "JV-CASF" is "a CASF which is jointly owned by (i) an acute care hospital that offers cardiac catheterization and [percutaneous coronary interventions] services, and (ii) one or more cardiologists who are licensed to practice medicine by the Mississippi State Board of Medical Licensure or a group practice comprised of such cardiologists." Miss. Dep't of Health, Div. of Health Plan. & Res. Dev., *FY 2022 Miss. State Health Plan* § 515.06(1)(b) (effective May 26, 2023), https://msdh.ms.gov/page/resources/16691.pdf.

¶3. In support of its CON application, JCH provided affidavits from seven cardiologists as well as financial analyses, including projected financial pro formas. JCH's proposed JV-CASF would be the only freestanding outpatient JV-CASF in Service Area 9, which consists

of counties along the Mississippi Gulf Coast.[1]

¶4.     MSDH issued its Staff Analysis recommending approval of JCH's CON application. In its Staff Analysis, MSDH found JCH's "project [wa]s in substantial compliance with the criteria and standards for the establishment of a [JV-CASF]" under the Mississippi State Health Plan and the CON Review Manual. Singing River requested a hearing challenging the Staff Analysis.

¶5.     A hearing was held before a hearing officer to evaluate the merits of JCH's CON application. At the hearing, JCH offered multiple witnesses in support of its CON application, including expert witnesses Steven C. Hockert and Daniel Carter. Singing River countered with testimony from various witnesses, including its own expert witness, David S. Levitt. Additionally, Glenn Wood, MSDH's division director of health policy and planning,[2] testified regarding MSDH's decision. Wood acknowledged various deficiencies in JCH's CON application but testified that MSDH carefully weighed the factors and determined "that the benefits of increased access in this case by the provision of outpatient cardiac services outweigh[ed] the potential economic effects in accordance with the State Health Plan criteria." Notably, Dr. Hugo A. Quintana, one of the physicians who provided an affidavit in support of the project, announced for the first time at the hearing that he was no longer supporting the project and would not perform procedures at the proposed facility unless required by insurance to do so.

---

[1] The other JV-CASFs are located in Hattiesburg and Flowood.

[2] Wood explained that the health policy and planning division reviews CON applications.

3

¶6. After three days of testimony and evidence, the hearing officer issued a Findings of Fact and Conclusions of Law recommending approval of JCH's CON application. MSDH's state health officer concurred with and adopted these findings of fact and conclusions of law and issued a final order approving JCH's CON application.

¶7. Singing River timely appealed to the chancery court. After oral argument, the chancellor entered a final judgment affirming the state health officer's approval of JCH's CON application.

¶8. Singing River timely appealed to this Court. On appeal, Singing River argues: (1) the hearing officer's determination of economic viability was arbitrary and capricious, (2) the proposed project will adversely impact Singing River's outpatient cardiac catheterization services, (3) the proposed project will adversely impact Singing River's ability to provide charitable care, (4) JCH's CON application failed to substantially comply with the State Health Plan and the CON Review Manual, and (5) the hearing officer's finding that the project satisfied the four general policies of the State Health Plan was arbitrary and capricious. We address each assignment of error but do so out of order.

**STANDARD OF REVIEW**

¶9. "On appeal, we give great deference to MSDH's decisions[,] [a]nd we affirm those decisions if supported by substantial evidence." *Baptist Mem'l Hosp.-DeSoto, Inc. v. Miss. State Dep't of Health*, 214 So. 3d 277, 279 (Miss. 2017) (citing *CLC of Biloxi, LLC v. Miss. Dep't of Health*, 91 So. 3d 633, 639 (Miss. 2012); *Miss. State Dep't of Health v. Rush Care, Inc.*, 882 So. 2d 205, 210-11 (Miss. 2004)). "Substantial evidence means more than a

4

scintilla or a suspicion." ***Miss. State Dep't of Health v. Natchez Cmty. Hosp.***, 743 So. 2d 973, 977 (Miss. 1999) (citing ***Miss. Real Est. Comm'n v. Anding***, 732 So. 2d 192, 196 (Miss. 1999)). "If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious." ***Id.***

¶10.   "A 'presumption of validity' attaches to the MSDH's decision[.]" ***Miss. State Dep't of Health v. Baptist Mem'l Hosp.-Desoto, Inc.***, 984 So. 2d 967, 975 (Miss. 2008) (citing ***Miss. State Dep't of Health v. Miss. Baptist Med. Ctr.***, 663 So. 2d 563, 579 (Miss. 1995)). "This Court may not substitute its own judgment for that of the agency which rendered the decision, nor may we re-weigh the facts of the case." ***Baptist Mem'l Hosp.***, 984 So. 2d at 975 (internal quotation mark omitted) (citing ***Pub. Emps.' Ret. Sys. v. Dishmon***, 797 So. 2d 888, 892 (Miss. 2001)). "The standard of review for questions of law is de novo." ***Ladner v. Ladner (In re Est. of Ladner)***, 909 So. 2d 1051, 1054 (Miss. 2004) (citing ***Parkerson v. Smith***, 817 So. 2d 529, 532 (Miss. 2002)).

## DISCUSSION

> I.      *Whether JCH's CON application failed to comply with the requirements set forth in the State Health Plan and the CON Review Manual.*

¶11.   The relevant standards and criteria for JCH's CON application are found in the State Health Plan and the CON Review Manual.  The State Health Plan includes four general certificate-of-need policies applicable to all CON applications, Miss. Dep't of Health, Div. of Health Plan. & Res. Dev., *FY 2022 Miss. State Health Plan* § 102 (effective May 26, 2023),

5

https://msdh.ms.gov/msdhsite/index.cfm/29,16691,184,pdf/State_Health_Plan_FY-2022-3.pdf, six policy statements regarding certificate of need applications for the establishment of cardiac ambulatory surgical facilities, § 515.06, and eleven certificate-of-need criteria and standards for the establishment of cardiac ambulatory surgical facilities, Miss. Dep't of Health, Div. of Health Plan. & Res. Dev., *FY 2022 Miss. State Health Plan* § 515.07 (effective May 26, 2023), https://msdh.ms.gov/page/resources/16691.pdf. The CON Review Manual includes sixteen general considerations that are applicable to all CON applications. Miss. State Dep't of Health, *CON Review Manual* § 8.1, https://msdh.ms.gov/page/resources/7167.pdf (last visited Jan. 20, 2026).

¶12. The hearing officer found that JCH's CON application substantially complied with the applicable criteria and standards set forth in both the State Health Plan and the CON Review Manual. Singing River disagrees.

¶13. Singing River asserts:

> The primary challenges raised by Singing River were that (1) as to numerous requirements that required an explanation of how [JCH] complied, [JCH] merely certified that it would or did comply; and (2) even where [JCH] provided a narrative response, it failed to provide an explanation sufficiently addressing the requirement imposed by the criteria.

Singing River claims that throughout his cross-examination at the hearing, "Wood agreed repeatedly that [JCH]'s responses were insufficient" but that "[t]he [h]earing [o]fficer ignored his testimony." According to Singing River, "[t]he [h]earing [o]fficer's conclusions regarding . . . Wood's testimony are the very definition of 'arbitrary and capricious' in that

6

they either misunderstand or wholly disregard testimony precisely to the contrary by the single witness most qualified to properly apply [MSDH]'s requirements to the Application."

¶14.    Singing River includes numerous "points [or statements] from . . . Wood's testimony" that it claims were disregarded or ignored by the hearing officer.  But as the chancellor noted,

> [T]he [h]earing [o]fficer's recommendation [wa]s not based solely on selected statements of . . . Wood on cross-examination; in fact, the recommendation [wa]s not based solely on the testimony of . . . Wood . . . . Instead, the [h]earing [o]fficer considered the testimony of numerous witnesses, affidavits, exhibits, financial proformas, physician letters, the entirety of JCH's Application and the Staff Analysis. . . . Clearly, the [h]earing [o]fficer did not act arbitrarily or capriciously in considering the ample evidence presented in addition to or in contradiction to the selected statement of . . . Wood. Similarly, for each of the twenty-four (24) specific selected statements of . . . Wood on cross-examination set forth by [Singing River], there is substantial evidence of other statements of . . . Wood, testimony of other witnesses and other evidence presented to provide a proper foundation for the [h]earing [o]fficer's recommendation.
>
> . . . .
>
> The Court will concede that perhaps [Singing River] [is] correct in some of [its] assertions regarding figures and/or statistics that may be somewhat skewed. However, the decision of MSDH was not based upon a single statistic or assertion; the decision was a thoughtful and reasoned response to a voluminous amount of evidence. The decision was supported by substantial evidence. "Substantial evidence means more than a scintilla or a suspicion." *Mississippi State Dep't of Health v. Natchez Community Hospital*, 743 So. 2d 973, 977 (Miss. 1999). The Court further concedes that [Singing River] produced credible contradictory evidence and assertions regarding many of the criteria to be considered in pursuit of a CON. However, this Court may not reweigh evidence or substitute its own judgment for that of the [h]earing [o]fficer. Instead, this Court is limited in determining whether the decision was supported by "more than a scintilla or a suspicion" of evidence. This Court must so find.

¶15.    We agree with the chancellor that the hearing officer's decision that JCH's CON application substantially complied with the applicable criteria and standards set forth in both

7

the State Health Plan and the CON Review Manual was supported by substantial evidence.

> II. *Whether JCH's CON application satisfied the four general policies of the State Health Plan.*

¶16. The four general CON policies in the State Health Plan are: (1) to improve the health of Mississippi residents; (2) to increase the accessibility, acceptability, continuity, and quality of health services; (3) to prevent unnecessary duplication of health resources; and (4) to provide cost containment. Miss. Dep't of Health, Div. of Health Plan. & Res. Dev., *2022 FY Miss. State Health Plan* § 102 (effective May 26, 2023), https://msdh.ms.gov/page/resources/16691.pdf. The hearing officer found that JCH's CON application substantially complied with all four general policies. Singing River disagrees and argues the hearing officer's findings were arbitrary and capricious.

¶17. But again, as the chancellor noted:

> The [h]earing [o]fficer heard testimony from supporting interventional cardiologists and . . . Wood regarding the enhanced access to outpatient cardiac services. Multiple interventional cardiologists testified that outpatient cardiac cath services provided at a freestanding CASF would provide substantial cost savings thereby reducing the financial burden on patients. . . . Carter testified that an outpatient CASF gives patients in Jackson County an alternative to hospital-based services, improving both convenience and affordability. The testimony of . . . Carter and . . . Wood established that no freestanding CASF currently exists along the Gulf Coast and the offering of same would not be a duplicative service as it would create a new, cost-effective care setting outside of the other hospital based programs. [Singing River] asserts that contrary testimony was offered at [the] hearing. While the same is true, this Court is tasked with determining whether the [h]earing [o]fficer based her recommendation on substantial evidence, not undisputed evidence. Clearly, the [h]earing [o]fficer had substantial evidence to support her determination that the project meets the purposes of the [State Health Plan].

We agree that substantial evidence supported the hearing officer's determination of

8

substantial compliance.

> III. *Whether the hearing officer's determination of economic viability was arbitrary and capricious.*

¶18. Under the State Health Plan, an applicant must "provide documentation that the CASF will be economically viable within two (2) years of commencement of services." Miss. Dep't of Health, Div. of Health Plan. & Res. Dev., *2022 FY State Health Plan* § 515.07(4) (effective May 26, 2023), https://msdh.ms.gov/page/resources/16691.pdf. An applicant must also demonstrate that the proposed facility will provide "a minimum of 300 cardiac catheterization procedures, diagnostic and therapeutic, per year, by the third year of operation." Miss. Dep't of Health, Div. of Health Plan. & Res. Dev., *2022 FY State Health Plan* § 515.07(1) (effective May 26, 2023), https://msdh.ms.gov/page/resources/16691.pdf. Additionally, the CON Review Manual requires the applicant to show economic viability, i.e., "[t]he immediate and long-term financial feasibility of the proposal, as well as the probable effect of the proposal on the costs and charges for providing health services by the institution or service." Miss. State Dep't of Health, *CON Review Manual* § 8.1(4), https://msdh.ms.gov/page/resources/7167.pdf (last visited Jan. 20, 2026).

¶19. The hearing officer found that "the [p]roposed [p]roject w[ould] be economically viable" and that there was "sufficient evidence to support the financial feasibility of the [p]roject." Singing River disagrees and argues that "the hearing officer's determination of economic viability was arbitrary and capricious."

¶20. To show the economic viability of its proposed JV-CASF, JCH offered Hockert, an expert in ambulatory surgery center (ASC) development. Hockert testified that he prepared

9

the project's financial pro formas after reviewing actual procedure volumes from the project's supporting cardiologists' electronic medical records using the 2022 and 2023 calendar years.[3] Starting with these actual numbers, Hockert eliminated procedures that were not approved by Medicare for an ASC setting. Hockert described this as a "hyperconservative" approach to projected revenue because it used only Medicare reimbursement rates for all procedures. He explained that he deliberately excluded the higher rates paid by commercial insurance payers to understate the facility's income potential. By ignoring any commercial premium in the projections, he ensured the pro formas would underestimate and not overstate the revenue potential. This methodology yielded a projected caseload that exceeded the State Health Plan's requirement of at least three hundred procedures by the third year of operation.

¶21. Carter, JCH's healthcare planning and finance expert, reinforced Hockert's point and confirmed that commercial insurance payers typically pay cardiac procedures "significantly more" than Medicare. As JCH noted, roughly half of the JV-CASF's cases are expected to be commercially insured, yet JCH assumed, for its conservative projections, that each case would be paid at Medicare's lower rate.

¶22. Singing River argues neither Hockert nor Carter "quantified the difference in dollars and cents between the Medicare allowable rate and the commercial rate." Singing River claims that because there is no evidence demonstrating the actual dollar figure difference between those rates, the hearing officer was simply guessing that the difference between the

_____

[3] Hockert referred to this as a "data dump" or a "document dump."

10

two rates would be enough.

¶23. Singing River further argues that "[e]ven more damning" is that Hockert's project pro formas were based heavily on the patient volume of Dr. Quintana, who testified for the first time at the hearing that he is no longer planning to participate in the business venture but will, instead, continue to perform his procedures at Singing River, where he has historically practiced. According to Singing River, Dr. Quintana's withdrawal from the proposed project undermines JCH's economic viability.

¶24. Singing River asserts Levitt, its healthcare planning and finance expert, demonstrated how JCH's projected utilization was insufficient. According to Singing River, Levitt analyzed four different scenarios based on JCH's claims in support of economic viability, and in each instance, Levitt demonstrated that the number of projected procedures was insufficient to establish economic viability.

¶25. The hearing officer found JCH's evidence regarding economic viability "to be reasonable and credible, that accounting for a higher reimbursement average would offset any potential loss of procedures." The hearing officer noted JCH's "hyperconservative" approach and found that despite Dr. Quintana's withdrawal from the project, he would perform procedures at the CASF if commercial payers required it. JCH produced detailed financial pro formas explaining the projected expenses and revenues, and it supported those documents with live testimony from Hockert and Carter. Multiple cardiologists also testified in support of the proposed project and in regards to their expected and intended use of the JV-CASF. While Singing River presented alternative and counter calculations through its

11

own expert, the presence of competing expert opinions does not render the hearing officer's decision arbitrary and capricious. "The weight and credibility of expert testimony are matters for determination by the trier of fact." *Banks ex rel. Banks v. Sherwin-Williams Co.*, 134 So. 3d 706, 711 (Miss. 2014) (internal quotation marks omitted) (quoting *Hubbard ex rel. Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 675 (Miss. 2010)). We agree that substantial evidence supported the hearing officer's conclusion regarding economic viability.

> IV. *Adverse Impact on Singing River's Outpatient Cardiac Catheterization Services*

¶26. The hearing officer noted that the issue of adverse impact "was a vigorously debated topic at the [h]earing[.]" The hearing officer found as follows:

> It is inevitable and bears acknowledgment that the [p]roject will likely have some impact on [Singing River], just as it is likely the establishment of the JV-CASFs in Hattiesburg and Flowood had some impact on local hospitals. However, the standard is whether the project will have a significant adverse impact. There is sufficient credible evidence to support [MSDH]'s finding that the project will not have a significant adverse impact on [Singing River] such as to warrant denial of the CON, and I find evidence to the contrary presented by [Singing River] not compelling. This is especially true when considering that one of the overall goals of health planning is cost containment. (Ex. 48) This would be the only JV-CASF in Service Area 9 providing improved access to cath services in an outpatient setting. The testimony credibly demonstrated a lower cost of the services at the JV-CASF as compared to the same services at the general acute care hospitals.
>
> . . . Wood testified that [MSDH] specifically included an "assessment of potential impact on existing facilities" but determined the benefits of increased access, improved patient outcomes and potential cost effectiveness outweighed the potential impact. . . .
>
> I found particularly compelling . . . Carter's testimony about [Singing River]'s projected adverse financial impact as purportedly shown in Exhibit 35 . Carter prepared the chart depicted in Exhibit 33 at page 21 using the same data from [Singing River]'s Exhibit 35. He said he applied [Singing River]'s

FY 2024 net revenue year to date, its margin and the net income for the first nine months of the fiscal year, all taken from [Singing River]'s documents, and annualized the 9 months of data. The results, he testified, demonstrated that on a net revenue basis, the impact would be approximately 1.7%, there would be a contribution impact of 8.5% and only a 1.4% change in income. (Tr. 463-66; Ex . 33 at 21) Mr. Carter testified that even if all of [Singing River]'s assumptions were true, the "impact overall in the operations of Singing River would be de minimis."

¶27.    Singing River argues, "the [h]earing [o]fficer ignored the evidence of the detrimental impact that the project will have on the finances of Singing River, and the undisputed evidence of how the lower staffing ratios will impact patients in the service area who need emergent cardiac cath procedures."  At the hearing, Singing River's executive director of finance, Sarah McGoldrick, explained that the financial statements relied upon by Carter contained a number of one-time payments that Singing River received during FY2024. According to McGoldrick, these one-time payments needed to be normalized through future budgeting processes.  But despite her testimony, McGoldrick conceded that Singing River projects a $5.7 million operating margin for FY2025.

¶28.    Similarly, Tim Neese, Singing River's director of cardiovascular services, testified that the proposed project would adversely affect its staffing issues.  But Singing River's chief financial officer testified that Singing River recently succeeded in recruiting and hiring two additional cardiologists.

¶29.    Singing River claims that the hearing officer "completely ignored the wealth of testimony demonstrating significant adverse impact to Singing River."  But simply because the hearing officer disagreed with Singing River and found in favor of JCH does not mean she "ignored" the evidence and testimony presented.  This Court agrees with the chancellor,

13

who stated,

> As routinely occurs in adversarial proceedings, the [h]earing [o]fficer was presented with conflicting testimony regarding the facts in this matter. She found the evidence presented in support of the [a]pplication to be more persuasive and credible with regard to the financial stability of Singing River and its ability to continue to staff its cardiac cath labs. This Court cannot find that the [h]earing [o]fficer lacked substantial evidence to conclude that the proposed project would not significantly adversely affect Singing River.

V.     *Adverse Impact on Singing River's Ability to Provide Charitable Care*

¶30.   Under the State Health Plan, "MSDH intends to disapprove CON applications if such approval would have a *significant* adverse effect on the ability of an existing facility or service to provide Medicaid/indigent care." § 102, https://msdh.ms.gov/page/resources/16691.pdf (emphasis added).   During the hearing, Singing River argued that if the proposed project was approved, it would pull much needed revenue from Singing River's profitable cardiac service lines, which is used to subsidize other unprofitable service lines at the hospital, thereby inhibiting Singing River's ability to maintain existing levels of service to Medicaid and indigent patients.   McGoldrick and Singing River's chief executive officer testified that revenues for a community hospital are treated differently from a for-profit hospital. Specifically, revenue that results in positive net operating income is invested back into the hospital by making market adjustments and merit adjustments to employee wages, reinvesting in facilities and equipment, and growing and expanding service lines.   According to Singing River, without that revenue, it will be forced to cut or reduce unprofitable service lines like behavioral health and labor and delivery, which, in turn, would deprive the indigent and Medicaid patient populations from having

14

access to these services.

¶31. But as the chancellor noted,

> Much of this testimony was premised on the assertion that Singing River could lose up to 75% of its outpatient cardiac cath volume if the proposed project was approved. However, this assertion is based on the premise that every outpatient case handled by JCH's interventional cardiologist partners will be performed at the new facility. Such an assertion is not supported by evidence.

¶32. Additionally, despite Singing River's assertions at the hearing, no evidence was presented that any charitable program would be cut. Indeed, McGoldrick did not testify to any planned reduction in charitable-care spending. And JCH committed to provide at least 5 percent of its services as indigent/charity care in compliance with the State Health Plan criteria.

¶33. We agree substantial evidence supported that JCH's proposed project would not have a *significant* adverse effect on Singing River's ability to provide charitable care.

## CONCLUSION

¶34. MSDH's decision is supported by substantial evidence, i.e., "more than a scintilla or a suspicion." *Natchez Cmty. Hosp.*, 743 So. 2d at 977 (citing *Anding*, 732 So. 2d at 196). Thus, MSDH's approval of JCH's CON application is affirmed.

¶35. **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., ISHEE, SULLIVAN AND BRANNING, JJ., CONCUR.**

15